IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PATRICIA I. ERMINI,
formerly known as PATRICIA I. MAPES,

        Plaintiff,

vs.                      Case No.: 2:15-cv-701-FtM-99CM

MIKE SCOTT, in his Official Capacity as Sheriff of Lee
County, Florida, CHARLENE PALMESE, individually,
RICHARD LISENBEE, individually,
ROBERT HAMER, individually and
WILLIAM MURPHY, individually,

        Defendants.

_____/

## AMENDED COMPLAINT and DEMAND FOR JURY TRIAL
### (Amending Count X Only)

COMES NOW, Plaintiff, PATRICIA I. ERMINI, formerly known as PATRICIA I.

MAPES,[1] by and through her undersigned counsel, and pursuant to Fed. R. Civ. P. 7(a), and files

this Complaint and Demand for Jury Trial, and sues Defendant MIKE SCOTT, in his official

capacity as Sheriff of Lee County Sheriff's Office, Defendant CHARLENE PALMESE,

individually, Defendant RICHARD LISENBEE, individually, Defendant ROBERT HAMER and

WILLIAM MURPHY, individually, for injuries and damages to her person and for the unlawful

deprivation of her rights guaranteed under the Fourth Amendment to the Constitution of the

---

[1]    Plaintiff's final divorce decree restored her previous name, PATRICIA I.
ERMINI. On the date of the incident, Plaintiff was still PATRICIA I. MAPES. Because all
records related to the incident refer to "MAPES," to avoid confusion, the Complaint will refer to
Plaintiff by her married name, MAPES.

United States, and alleges as follows:

## JURISDICTIONAL ALLEGATIONS

1.      This is an action brought pursuant to Title 42 U.S.C. Section 1983, and Title 28 U.S.C.

Section 1343, seeking damages including costs of litigation and reasonable attorney fees, against

Defendants MIKE SCOTT, CHARLENE PALMESE, RICHARD LISENBEE, ROBERT

HAMER and WILLIAM MURPHY for committing acts, under color of state law, which

deprived Plaintiff of her rights secured by the Fourth Amendment to the Constitution and laws of

the United States.  This Court has original jurisdiction pursuant to Title 28 U.S.C. §§ 1331 and

1367.

2.      Plaintiff also seeks the Supplemental Jurisdiction of this Court, pursuant to 28 U.S.C.

1367, against Defendants MIKE SCOTT, CHARLENE PALMESE, RICHARD LISENBEE,

ROBERT HAMER and WILLIAM MURPHY for acts committed under the common law and

statutes of the State of Florida, in that such claims derive from a common nucleus of operative

facts and are so related to the claims in this action within the Court's jurisdiction, that they form

part of the same case or controversy.

3.      The violations of Plaintiff's rights alleged herein were committed within Lee County,

Florida, and venue is proper in this district pursuant to U.S.C. Section 1391(b).

4.      All conditions precedent required by Florida law for the filing of this Complaint,

including notification of certain Defendants pursuant to Section 768.28, *Florida Statutes*, of any

state law claims, have been met.

## PARTIES

5.      At all relevant times, Plaintiff, PATRICIA L. MAPES, ("MAPES") was a citizen of the

United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States.  On March 23, 2012, MAPES was shot and critically injured by ROBERT HAMER after she was found asleep in her Lee County home by CHARLENE PALMESE, RICHARD LISENBEE and ROBERT HAMER.

6.      At all relevant times, including March 23, 2012, Defendants CHARLENE PALMESE ("PALMESE"), RICHARD LISENBEE ("LISENBEE") and ROBERT HAMER ("HAMER") also collectively referred to herein as the "DEPUTIES," were employed by the Office of Sheriff of Lee County and were acting individually, as well as under color of authority of the laws of the State of Florida. At all relevant times, the DEPUTIES were trained in police work, including, but not limited to, the Fourth Amendment to the Constitution of the United States, lawful search and seizure and the limitations placed on the use of deadly force.

7.      At all relevant times, including March 23, 2012, Defendant WILLIAM MURPHY ("MURPHY") was employed by the Office of Sheriff of Lee County, was superior in rank to the DEPUTIES and a member of the Major Crimes Unit, and was acting individually, as well as under color of authority of the laws of the State of Florida. At all relevant times, MURPHY was trained in police work, including, but not limited to, the Fourth Amendment to the Constitution of the United States, lawful search and seizure and the limitations placed on the use of deadly force.

8.      At all relevant times, including March 23, 2012, Defendant MIKE SCOTT ("SCOTT") was employed by the Office of Sheriff of Lee County ("LCSO"), was the senior law enforcement officer in the Lee County Sheriff's Department and was acting in his official capacity as Sheriff under color of authority of the laws of the State of Florida.

9.     Defendants CHARLENE PALMESE, RICHARD LISENBEE, ROBERT HAMER and WILLIAM MURPHY, at all times material to this action, were engaged in activities best described as "operational" level decision-making within the Lee County, Florida, Sheriff's Department. In as much as these activities do not fall into the category which involves broad policy making or planning and hence do not involve discretionary governmental functions, the Defendants named in this paragraph are not immune from tort liability under the provisions of Section 768.28, *Florida Statutes*, and the Constitution of the State of Florida.

## FACTUAL ALLEGATIONS

10.     On March 23, 2012, MAPES talked to her divorce lawyers and was told that her husband of less than two years would likely get half of the assets she had left after the short-term marriage. She was almost broke from the costs of fighting over her remaining assets and was upset by the news from her lawyers. She called her daughter, Robin LaCasse, ("LaCasse") who lived in Maine. Because MAPES was crying on the phone, LaCasse told her to hang up and calm down and call her back. MAPES composed herself and called her daughter back. When she didn't get an answer, she went to bed.

11.     At about 8:40 PM that same evening, LaCasse called the Lee County Sheriff's Office ("LCSO") to request a wellness check of MAPES.

12.     LaCasse told the dispatcher that her mother had been going through a difficult divorce for two years, was broke and had received bad news from her divorce attorney that day. LaCasse was worried because she had not been able to reach her mother for the past hour. She told dispatch that MAPES' phone was not set to ring at the time. LaCasse said her mother was really distraught over the divorce, but claims she never told dispatch her mother was suicidal.

13.     Dispatch asked LaCasse if MAPES had any weapons and was told she had a pistol but had never threatened to use it.

14.     LaCasse said MAPES had denied consuming any alcohol, but LaCasse thought she had been drinking.

15.     In response to LaCasse's call, LCSO dispatch radioed PALMESE and advised her of the request for a wellness check. Dispatch told PALMESE that MAPES was 70 years old, a "49-T," or suicide threat, was going through an ugly divorce, was possibly intoxicated and had a weapon in the house or on her person. Dispatch said the call came from MAPES' daughter who lived out of state.

16.     PALMESE, LISENBEE and HAMER all responded to the 911 call for the wellness check.

17.     The DEPUTIES claim they entered the residence through the unlocked front door. They entered without a warrant and without consent, and say they announced their presence. LISSENBEE opened the right-side french door into MAPES' bedroom, shined his high-intensity flashlight into the bedroom and on MAPES and saw she was asleep in her bed.

18.     MAPES woke up when she heard intruders in her darkened home. The sound of intruders in her home during the night caused her heart to pump in fear and panic. She heard someone say, "she's in this room" and she called out to the intruders to leave. She told the intruders to get out of her house. She got out of bed but her heart was pounding. She was alone and dressed in nothing but her bra and panties. She started walking toward the closed left-side french door into her bedroom door to hide and told the person shining the light in her face to turn off the light. She thinks he shut off his light but remembers there was another light on her. She told them to

leave again. She heard no response then heard someone try to tell her he was with the Lee County Sheriff.

19.     MAPES told the voice behind the bright light she said she didn't call the sheriff's department and yet again told the person to get out of her house. Contrary to later reports, MAPES never said she had a gun and would shoot them, because she was taught in the gun safety class she took after purchasing her gun, that you never threaten to shoot - ever. MAPES does not recall ever having her gun in her hand. She is also right-handed, so even if she had picked up her gun, no one could have seen as it was her left hand that was closest to the open bedroom door.

20.     As MAPES walked toward the closed bedroom door, the person started shooting - and kept shooting. It sounded like bombs were going off. MAPES thought she told him to stop shooting. She heard someone say, "get that thing out of here. You've already hit her and she's on the floor. She doesn't have a gun in either hand." MAPES' neighbor, who was outside at the time, heard seven shots in rapid succession. MAPES never shot her gun.

21.     HAMER radioed dispatch that shots were fired.

22.     MAPES was told by someone she killed a cop. PALMESE said MAPES was conscious and kept saying "who are you?" and "I shot you?"

23.     Deputy Pannone with LCSO arrived just after the shots were fired and saw PALMESE and LISENBEE standing in the kitchen while HAMER applied pressure to the wound in MAPES' leg. He saw a Glock handgun sitting on a chair with a magazine still inserted and removed the magazine. No bullet was in the chamber, but the top bullet in the magazine was not seated properly.

24.     Sergeant Bill Lucas with LCSO arrived on the scene next and covered MAPES' shoulder wound with a towel he found in the bathroom.

25.     Lieutenant Ryan Bell with LCSO was wearing plainclothes when he arrived on the scene. He put his shoe on a spent casing in the doorway to the bedroom so it would not be disturbed while EMS treated MAPES. EMS had difficulty getting around him to treat MAPES' critical injuries, but he refused to move out of the way. Bell went to the hospital to "stand by" MAPES and when medical staff asked him to remove the handcuffs so they could treat MAPES, he finally had another deputy remove them.

26.     Immediately after the shooting, PALMESE, LISENBEE and HAMER were escorted from the scene and the Major Crimes Unit took over the investigation.

27.     MAPES was taken to Lee Memorial Hospital in critical condition. She had multiple gunshot wounds, including in and out wounds to her left leg, a fractured femur, in and out wounds to her right shoulder and arm and a wound on the right side of her head. Hospital staff said she arrived alert and awake but confused about happened. She had wounds and blood spots all over her face from wood splinters hitting her face.

28.     Hospital staff were told by LCSO that MAPES had attempted to murder members of the Lee County Sheriff's Department. Some hospital staff did not want to treat her and one nurse told her, "you're a cop killer." When she was asked why she was there, she said she was told she had killed a cop. It wasn't until much later she found out she had not hurt anyone.

29.     On March 24, 2012, at 12:35 AM, just hours after the shooting, MURPHY called LaCasse, to get "additional information." She was asked when MAPES moved to Lee County, where her estranged husband was living, the status of the divorce, why MAPES was upset with

her divorce attorney and where her divorce attorney was located. She was asked what her mother meant when she said she "couldn't take it anymore" and she said she thought MAPES meant she would quit fighting and let her husband have what he wanted in the divorce. She said her mother had been depressed for a long time, but had no history of threatening suicide.

30.    MURPHY asked LaCasse about MAPES' medical history, whether she was an alcoholic, and her handgun. She said MAPES had the gun and slept with it because "she was afraid that someone would break in at night." She lived alone in an isolated location. LaCasse had never seen MAPES fire the gun. She was asked how MAPES felt about law enforcement, whether she had any "run-ins" with law enforcement and whether she had ever been violent with anyone.

31.    MURPHY asked her "hypothetically" what she would say if he told her MAPES had pointed her gun at the deputies after they identified themselves and fired a shot at them. She said she "couldn't picture it."

32.    When LaCasse asked MURPHY if MAPES was going to jail, MURPHY finally told her MAPES was in the hospital and in the custody of law enforcement and she was likely going to be arrested.

33.    LaCasse was informed MAPES' home was a "crime scene" and LCSO would be issuing a search warrant in the morning. LACasse was told the family could not see MAPES and if they wanted to know about their mother's condition, they were only to talk to MURPHY. Finally MURPHY told LaCasse the Sheriff's Department was looking into asking for an involuntary commitment of MAPES under the Baker Act.

34.    On March 24, 2012, a Lee County Crime Scene technician photographed MAPES in the Intensive Care Unit of Lee Memorial Hospital and LCSO released the photo of MAPES taken in

the Intensive Care Unit to the media along with a statement that when deputies went to conduct a well-being check, they were met by an armed "suspect" and shots were exchanged.  LCSO reported that "it was not clear of the person's link to the original call to law enforcement." The released photo clearly shows the wounds to MAPES' face from flying wood splinters.

35.      On March 24, 2012, SCOTT told reporters that the call was little more than a welfare check and they were there to help MAPES and help the situation.

36.      On the morning of March 24, 2012, MURPHY, who was not a witness and not present during the wellness check, sought a search warrant for MAPES' residence in Fort Myers.  The Affidavit MURPHY executed in support of the search warrant stated that MAPES had violated Section 782.04, *Fla. Stat.*, attempted murder of a law enforcement officer.

37.      MURPHY'S Affidavit said that the investigation had revealed the following facts: dispatch received a 911 call from MAPES'S daughter who said MAPES had been making suicide threats, and when deputies arrived at her residence the "door was open."  After the deputies entered the residence they encountered MAPES who was armed with a gun and threatened to kill the deputies. The Affidavit said MAPES raised her gun and fired a round and a deputy returned fire striking MAPES in the upper and lower body.

38.      MURPHY'S Affidavit said that as probable cause for the crime had been alleged and found, the items to be searched included: any cellular phones, or other communication devices "utilized in the planning, executing, or facilitating of the crimes being investigated," *ie.,* attempted murder, including photographs, text messages, text documents, and "any and all physical and trace evidence, and or instrumentalities of the crime currently being investigated." MURPHY affirmed there was probable cause to believe the crimes as described had been

committed and he "expressly" found probable cause for issuance of the search warrant.

39.     On March 24, 2012, the search warrant was issued by the Court and served on MAPES' residence while she lay in intensive care. The Lee County Sheriff's Department Crime Scene Unit entered her home, including canine units to search for drugs. The search lasted three days during which MAPES' entire home and all her possessions were searched and her home was photographed, dusted for fingerprints and diagramed. The officers opened and searched drawers, closets and cupboards and inspected their contents. They dug bullets and fragments out of her bedroom wall and window where they had stopped after all of them had gone through the bedroom door and some had also gone through MAPES, and they knocked out an entire section of her upper kitchen wall and ceiling to get a bullet that had lodged in a roof truss. MAPES' private home was subjected to an exhaustive and intrusive search.

40.     The Crime Scene Investigation Report alleged seven bullets were discharged. Six of the bullets traveled from left to right through the left-side master bedroom door that was closed at the time of the incident and continued to the far wall of the bedroom. The trajectory of a seventh bullet was inconclusive. The Report said an eighth bullet went through the west kitchen wall near the ceiling and lodged in a roof truss in the attic.

41.     A property receipt dated March 24, 2012, listed the charge as assault in violation of F.S. 784.07(2)(c). During the search, the Crime Scene Unit seized MAPES' gun, the spent casings and the recovered bullets. They also seized MAPES' personal papers, including her divorce papers, MAPES' wallet, cash and credit cards, her clothing, three cell phones and a personal camera. They reviewed all her text and phone messages, the names of her personal contacts and all her photographs. MAPES' prescription drugs for treating her blood pressure, thyroid and

cholesterol were also seized.

42.     After searching MAPES' home for three days, LCSO completed the search on Monday, March 26, 2012, at about 3:00 PM.

43.     On March 29, 2012, MAPES was arrested by MURPHY and charged with two felony counts of Aggravated Assault on an Officer in violation of FS 784.07(2)(c). The probable cause statement was made by MURPHY, who was not present during the incident and the statement did not name the officers who were present at the scene that she was charged with assaulting. The narrative was not in the first person and MURPHY did not state the basis for his knowledge, except to say it was based on the "investigation."

44.     On March 29, 2012, MURPHY completed two "Victim's Form" listing Deputy Richard Lisenbee and Deputy Robert Hamer as victims of aggravated assault on a law enforcement officer.

45.     On March 30, 2012, after the sworn statements of the PALMESE, LISENBEE and HAMER had been taken, the Sheriff's Department reported to the media that MAPES fired at three deputies and they fired back because "after she started shooting, they thought they were going to die." In response to a question about shooting a 71 year old woman, SCOTT told reporters that when "somebody starts shooting at us, we don't ask them how old they are."

46.     MAPES required multiple surgeries to repair her femur and address her wounds, including multiple skin grafts. Medications were used to control atrial fibrillation. Based on statements by the Lee County Sheriff's Department to the medical staff that MAPES was suicidal and waving a gun around, she was Baker-Acted. Her family was denied visitation by LCSO. On April 2, when LCSO finally allowed the hospital staff to speak with MAPES' family about the

incident, the Baker Act was lifted. The family described LCSO as "less than helpful" about

telling them the medical condition of their mother and the circumstances that led to her shooting.

47.    MAPES was treated for the wood splinters in her face and splinters that lodged in her eye.

They were able to save the eye with surgery, but her vision has deteriorated since the incident.

48.    MAPES was moved out of intensive care on April 1, 2012, and discharged on April 18,

2012. Two of her children moved to Florida to care for her after her discharge. After discharge,

she suffered a severe septic infection which caused her tremendous pain. The pain medications

induced debilitating paranoia.

49.    On June 5, 2012, the State of Florida announced that it was not filing on the charges

against MAPES.

50.    In 2013, the State Attorney's Office opened an investigation on the use of lethal force

against MAPES by the Lee County Sheriff's Office. The investigation specifically did not

consider the methodology or procedures used by Lee County and the investigation relied on the

file created by the Lee County Sheriff. The State was told by LCSO that MAPES was

"extremely suicidal" and found the deputies had not violated the criminal laws of Florida. The

State Attorney's office has a history of clearing officers accused of excessive force. Just two

years before this incident, Lee County had the highest rate of reported misconduct in the country

among police agencies of its size.

51.    MAPES continues to struggle with the long-term physical and emotional consequences of

the shooting and her treatment by the LCSO.

Sworn Interview Testimony Taken Before Arrest of MAPES

52.    Roy Mapes, the estranged husband, was interviewed on March 24, 2012, by MURPHY

and told MURPHY MAPES was a quiet person and not outgoing. She was never overtly aggressive or violent and he never saw any issue with authority. Her alcohol consumption was almost "non-existent." He knew there was a gun in the house but he did not know what kind it was and had never even seen it. MAPES told him that after he moved out, she kept the gun on the night stand but he had never known her to even suggest she would use a gun.

53.     On March 26, 2012, MURPHY took the sworn statement of PALMESE about the night of March 23. At the time of the incident, PALMESE had been on road patrol for about five months. She carried a gun with a flashlight and used it during the incident. When she arrived, the house was dark inside and quiet and she "had a bad feeling" and told LISENBEE she wanted to wait for another unit. When HAMER arrived, they went in. There were no lights on. LISENBEE announced "Lee County Sheriff's Office." LISENBEE opened the bedroom door without knocking. PALMESE did not hear all that MAPES said, but as she was backing out, she heard her say "I'm gonna shoot you." That was all PALMESE focused on. The next thing she knew, she heard gunfire and thought, "oh, shit." She did not know where either LISENBEE or HAMER were standing because she was backing up. She did not see MAPES until after MAPES was shot and she did not know if she shot a gun. After the shooting, MAPES seemed confused. She did not render any emergency assistance to MAPES.

54.     On March 26, 2012, MURPHY took the sworn statement of LISENBEE about the night of March 23. LISENBEE had been with LCSO for about six months. He had been with Florida Highway Patrol Auxiliary since 2009 and assisted troopers while he worked at another job. He arrived at MAPES' residence and observed no lights were on outside the house. He opened the screen door and latched it to stay open and knocked on the front door saying "Sheriff's Office."

There was no response. He used his flashlight to check the front door and discovered it was unlocked. He opened the front door, shined his flashlight inside and asked if anybody was home. There was no response. He and PALMESE went inside and decided to back out and wait for more people. HAMER arrived with a rifle and they went back inside.

55. LISENBEE went to the bedroom double doors, but only one door opened. He opened the door and with his flashlight saw a female on the bed. He was using a high intensity Streamlight flashlight to illuminate MAPES. He did not see a weapon. He announced Sheriff's Office and said they were there to help, and MAPES said, "who's there, who's there?" He said Sheriff's Office and MAPES said "what are you doing here?" Then she said, "you better get outta here or I'm gonna shoot you" and "get out of my house." LISENBEE started backing out but did not tell MAPES he was backing out. HAMER was behind the couch in the living room. LISENBEE had his flashlight up illuminating MAPES and his firearm ready. HAMER also had his flashlight out. LISENBEE was "scared shitless" at the sight of a gun. He never saw MAPES in the doorway and never saw her with a firearm. He just saw a handgun, illuminated by the flashlights, coming around the closed-side of the bedroom doors and then HAMER shot six or eight rounds. He did not know if MAPES even fired her gun or if she fired first. MAPES had fallen to the ground and HAMER kicked her gun away. After MAPES was shot she kept saying, "what are you doing here? What's happening?" She did not seem like she knew what was going on. LISENBEE did not render any emergency assistance to MAPES.

56. LISENBEE said he decided to go into the house because if someone is attempting or committed suicide you want to try and save their life. You have to go in and check on the person.

57.    LISENBEE, who was standing in front of the bedroom doors, never saw MAPES in a "shooting position," never told her he was "backing out," never told her to drop her weapon and never warned the person he was "trying to help" that he would use deadly force against her.

58.    Before his formal interview, HAMER said while the DEPUTIES were inside a female exited the master bedroom with a gun in her hand, raised the gun and pointed it at HAMER. In response, HAMER shot the female. After being shot, the female fell backwards, and dropped her handgun. On March 26, 2012, MURPHY formally interviewed HAMER. HAMER was with NYPD for three years and LCSO for seven years before the incident. He had recently been doing a lot of room clearing and active shooter training. When he arrived at MAPES' residence he retrieved his rifle from the trunk because they had to "clear the house" and MAPES had threatened suicide. His rifle had an EOTech tactical sight and a tactical light on it. As he was senior person, HAMER made the call go in and "clear the house." He said they announced and then didn't make any noise, they were "nice and quiet." As he was clearing the residence, he shined his light in the bedroom and said one of the doors was open and one was shut. He heard MAPES ask in a clear voice, "who is it?" and heard LISENBEE respond that it was the Lee County Sheriff. When he heard MAPES say "I'm going to shoot you," he "took the point" as LISENBEE was backing up.

59.    HAMER said he saw a lady come out of the french doors. It was dark and he had the light on his rifle to see who was coming out. As MAPES rounded the door to the living room, half her body was exposed and the other half was "kind of" behind the door. She had a handgun directly in front of her in both her hands and was pointing it directly at HAMER. He said MAPES was facing him, had a clear view of him and said, "I'm going to shoot you." HAMER

saw the barrel and saw her right index finger on the trigger.  In fear she was going to shoot, he shot first.

60.    HAMER never started to back out after MAPES told the DEPUTIES to leave, never told MAPES to drop her weapon and never warned her he had a gun pointed at her and would use deadly force to shoot if she failed to drop her gun.

61.    MAPES asked him, "why are you trying to kill me?" and "what are you doing here?" and "why are you shooting me?"  Like LISENBEE, he said, "we're here to help."  MAPES was wearing nothing but her bra and underwear.

62.    HAMER claimed MAPES' gun was by her left hand and he kicked it away from the critically wounded MAPES, and put handcuffs on her.  He was the only person that saw the location of the gun after the shooting.  After kicking the gun away, he stepped over MAPES and continued to "clear" the bedroom, the bathroom and the bedroom closet.  After he finished clearing, he started to treat MAPES' gunshot wound to the leg.  He thought the wound to her arm was just a graze wound.

63.    HAMER thought she fired her gun, based on the bullet hole in the kitchen ceiling, but did not know when it was fired.

64.    HAMER said it was their job to go inside and provide medical attention until EMS arrived.  Leaving the scene was not an option.

65.    On March 29, 2012, Detective Matthew Sands on the Major Crimes Unit, took the sworn statement of Emergency Medical Technician Melissa Detloff, who said when EMS arrived, she observed some deputies standing around and two people holding pressure on two of MAPES' wounds.  MAPES was handcuffed and appeared to be a pale, elderly female.  Detloff said

MAPES appeared confused at the hospital and didn't understand what was going on. She kept asking, "why are these people shooting at me?" and "don't let somebody shoot me."

66.     EMS paramedic Ronald Sharp was also interviewed on March 29, 2012, by Detective Matthew Sands.  Sharp had been with Lee County for seven years at the time of the incident, and said they were called initially on a possible suicide with a possible weapon on the scene.  He observed that it was pretty dark outside MAPES' residence and was quite dark inside as well.  He saw a number of police officers in the house and saw two gentleman applying pressure to wounds in MAPES' thigh and her upper right arm.  He asked who the gentlemen were but they did not identify themselves.  He said they were "plain clothes gentlemen."  He was told MAPES was shot with a rifle.  Based on her age and her life-threatening injuries, he considered MAPES a trauma alert that needed a Trauma Center.  He initially found four wounds.

67.     Sharp said MAPES kept asking why she had been shot, who shot her, who were the people or who were those men in her house, why were they there and why did those men shoot her?  She was confused about why anybody would want to shoot her and why was she shot.  She never mentioned firing a weapon.  She was able to tell EMS her name, date of birth and her address.  She understood she was going to the hospital, was never combative and was cooperative.  Due to her injuries, she was in a lot of pain and screamed when EMS tried to move her.  She did not appear intoxicated.  She was elderly and in shock from her significant injuries and confused about what happened.

68.     MAPES was interviewed by MURPHY on March 29, 2012, while she was still in intensive care for her life-threatening wounds and on numerous drugs for pain.  She repeatedly asked that the interrogation be stopped and asked for help with the unbearable pain from the

restraints she had to endure under the Baker Act. MURPHY told MAPES he could not talk to the doctors about her pain until she talked with him. She said she never called anybody to her house on March 23 and did not remember what she was talking to her daughter about that day. She said after she hung up, she went to bed because she was tired. She woke up when she heard someone in her house and asked, "what are you doing in my house?" She remembered saying "please get out of my house or I'm going to shoot you" because she was alone and afraid. She didn't know why someone was there to shoot her. She did not remember what the people in her house said or if she shot her gun. She could not believe they were police because she didn't know why police would break into her home. She remembered hearing a woman say "in here," She remembered hearing someone say she was already dead and to stop shooting.

### Sworn Interview Testimony Taken After Arrest of MAPES

69.    Edward Davis, a Lee County firefighter who also arrived on the scene, was interviewed by MURPHY on April 10, 2012, and said he opened the other french door into the bedroom so EMS could get the stretcher closer to MAPES. When she was moved, he noticed "quite a bit of blood" and said she suffered from considerable blood loss while being moved from the bedroom to the ambulance, requiring rapid intervention and establishing an IV. He said the handcuffs on MAPES made it impossible to start the IV which MAPES desperately needed but LCSO would not remove them.

70.    Lieutenant Brian Dubrasky was interviewed by MURPHY on April 10, 2012, and said they were responding to what they thought was a suicide call. He said it was very dark outside. MAPES kept asking, "why did you shoot me?" and saying, "I was just sleeping." He also said the handcuffs made it impossible to start an IV and that EMS even radioed during transport to

ask for a deputy to flag the ambulance down and remove the handcuffs so EMS could get access to her veins due to blood loss. He said all the deputy vehicles in the driveway and on the narrow street, made it difficult for EMS to get the ambulance out. He observed no resistence to treatment nor any aggression from MAPES.

71.     Firefighter Joseph Hrabak was interviewed by MURPHY on April 19, 2012. He had been advised it was a possible suicide, then a gunshot wound to the leg. He had to pull a couple pins to open the other bedroom door to gain access to MAPES because what he thought was a plainclothes detective was standing in the doorway maintaining evidence and would not move. He said MAPES kept asking, "why did you shoot me? I was just sleeping." When he asked at the scene what happened, he was told, "oh, she's been shot." He said when he considered her wounds, he puzzled over the angle of trajectory because MAPES had wounds to the left leg and right shoulder and arm as well as fragments and bleeding on the back of her head.

## FEDERAL CLAIMS

## COUNT I

## Violation of Civil Rights of MAPES Against CHARLENE PALMESE, RICHARD LISENBEE and ROBERT HAMER for Unlawful Search and Seizure Pursuant to 42 U.S.C. §1983

72.     Plaintiff realleges the allegations of paragraphs 1-9, 10-28, 46-51 and 53-71, above, as if fully set forth herein and further alleges:

73.     The DEPUTIES violated the clearly established and well-settled federal constitutional rights of MAPES, including, but not limited to, her Fourth Amendment rights of:

a.     Freedom from search of her home without warrant or consent;

b.     Freedom in her home from governmental intrusion;

c.      Freedom from unreasonable seizure of her person; and

d.      Freedom from illegal detention and deprivation of her liberty without due process of law.

74.     The DEPUTIES acted under color of state law in depriving MAPES of her right to be free from unlawful search and seizure in her home and otherwise deprived her of due process of law in violation of the Constitution of the United States.

75.     When the DEPUTIES decided to enter MAPES" home without consent and without a warrant, they were engaged in the operational task of responding to a 911 call under an alleged community caretaker, or emergency aid, exception to the warrant requirement to conduct a wellness check to prevent possible injury to MAPES. None of the officers that entered MAPES' home were engaged in any duty related to the duty to investigate and uncover criminal activity, as such, their actions did not fall within the scope of their discretionary authority. Each deputy said leaving was not an option when performing a wellness check.

76.     Even if the initial entry by the DEPUTIES was constitutionally permissible under an alleged community caretaker, or emergency aid, exception to the warrant requirement to help MAPES because the officers were told she was in danger or in need of assistance, when the DEPUTIES entered the home, they found MAPES asleep in her bed without a weapon and in no immediate or grave danger of committing suicide or requiring emergency assistance to prevent serious bodily injury.

77.     After MAPES told the DEPUTIES in a clear voice to leave her home any exception to the warrant requirement justifying the DEPUTIES' presence in her home dissipated and the DEPUTIES were required to leave.

78.     MAPES recognized that someone was in her home, she was privileged to refuse the

continued presence of the unknown person(s), even if they claimed to be with LCSO and she gave the unknown person(s) fair and clear notice to get out of her home. The DEPUTIES refusal to leave because they were there to "help" her and their continued unlawful seizure of her person, were objectively unreasonable under the circumstances and a violation of her Fourth Amendment rights.

79.     The "help" the DEPUTIES gave MAPES while unlawfully seizing her person without probable cause and searching her home without warrant and without consent, included shooting her multiple times and grievously injuring her.

80.     After using deadly force against MAPES, PALMESE and LISENBEE continued their unlawful seizure of MAPES by remaining in her home and continuing the search of her home they had started before shooting her.

81.     After HAMER shot MAPES multiple times through a bedroom door, he handcuffed the severely injured and elderly woman who was not a threat to anyone and he also continued to search her home. When EMS arrived, the DEPUTIES continued the unlawful seizure of MAPES by refusing to remove the handcuffs, even when the handcuffs prevented the emergency medical staff from properly treating MAPES for the multiple gunshot wounds HAMER had inflicted on her. Such continued search and detention by the DEPUTIES was unreasonable and unwarranted under the circumstances and a violation of MAPES' constitutional rights under the Fourth Amendment.

82.     As a direct and proximate result of the unconstitutional conduct the DEPUTIES, as alleged above, MAPES has suffered damages, including the costs associated with her criminal defense, severe and crippling permanent bodily injury and the resulting physical pain and suffering,

emotional distress, personal humiliation and mental anguish and suffering, and she has suffered

the loss of her capacity for the enjoyment of life.

83.     MAPES has been required to engage the services of the undersigned counsel and to pay

her a reasonable fee for her services, and she is entitled to reimbursement therefore from

Defendants CHARLENE PALMESE, RICHARD LISENBEE and ROBERT HAMER pursuant to

the provisions of 42 U.S.C. Section 1983.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI,

demands judgment for damages against Defendant CHARLENE PALMESE, Defendant

RICHARD LISENBEE and Defendant ROBERT HAMER, together with pre-judgment interest,

interest, attorneys fees, costs of the action, and TRIAL BY JURY.

## COUNT II

### Violation of Civil Rights of MAPES Against ROBERT HAMER for Excessive and Deadly Force Pursuant to 42 U.S.C. §1983

84.     Plaintiff realleges the allegations of paragraphs 1-9, 10-28, 46-51, and 53-71 above, as if

fully set forth herein and further alleges:

85.     HAMER violated the clearly established and well-settled federal constitutional rights of

MAPES, including, but not limited to, her Fourth Amendment right of:

a.     Freedom from the use of unreasonable, excessive deadly force; and

b.     Freedom from illegal detention and deprivation of her liberty without due process of law.

86.     HAMER acted under color of state law in depriving MAPES of her right to be free from

the use of unreasonable, excessive deadly force and otherwise deprived her of due process of law

in violation of the Fourth Amendment to the Constitution of the United States.

87.     When HAMER decided to enter MAPES' home without consent and without a warrant, he

was engaged in the operational task of responding to a 911 call under an alleged community caretaker, or emergency aid, exception to the warrant requirement to conduct a wellness check to prevent possible injury to MAPES. HAMER was not engaged in any duty related to the duty to investigate and uncover criminal activity, as such his actions did not fall within the scope of his discretionary authority. HAMER said leaving was not an option when performing a wellness check.

88.     MAPES was asleep in her bed, and at some point heard noise and asked, "who is there?"

89.     HAMER claims the DEPUTIES identified themselves as with the Lee County Sheriff, but it is patently unreasonable to enter a home in the dark, in the night, wake a law-abiding elderly woman who is living alone and sleeping, and think that in the dark she will "understand" that the intruders she hears are law enforcement officers. It was MAPES that was in fear for her life when the DEPUTIES were in her home.

90.     HAMER entered the residence with an assault rifle to conduct the wellness check because he was told MAPES owned a handgun. He was not told her handgun was illegal or even that it was currently in her possession. Once inside, after any justification for his presence in MAPES' home without consent and without a warrant had dissipated, his response to MAPES' warning to get out was to drop to his knee, commando-style, and prepare to shoot her, all the while justifying his presence as necessary to "protect" her from doing injury to herself.

91.     HAMER'S "help" was his decision to use unreasonable and excessive deadly force against MAPES instead of leaving her home after she told him to leave. Before shooting MAPES, HAMER never told MAPES he had a weapon trained on her, never issued an order to MAPES to drop her weapon, if indeed he saw a weapon, never told her he would use deadly force against her

and never told her the DEPUTIES would withdraw from her home. HAMER never even shouted

a warning to the other DEPUTIES about a gun, if he saw a gun. In refusing to leave, in using

unreasonable and deadly force against MAPES and in continuing his search of her home after he

shot MAPES, HAMER violated her well-established rights guaranteed under the Fourth

Amendment of the Constitution of the United States

92.     The force used by HAMER was unreasonable under the circumstances in that HAMER

fired his shotgun at MAPES seven times in rapid succession while she was standing behind her

bedroom door, striking her multiple times in her left leg, right arm and shoulder and her head and

causing her life-threatening injuries. HAMER only "de-escalated" his use of deadly force after

MAPES was on the bedroom floor bleeding profusely.

93.     HAMER'S use of deadly force "because he was in fear for his life" was unsupported by

the facts and objectively unreasonable under the circumstances because MAPES was hiding

behind her bedroom door. In using unreasonable and deadly force against MAPES, HAMER

ignored the fact that MAPES clearly was not in need of his "help," had not acknowledged that she

believed the intruders were law enforcement and had ordered him out of her home.

94.     HAMER said he fired his weapon at MAPES in response to her resistence but she had

committed no crime and had violated no law by sleeping in her own home and owning and

possessing a legally registered firearm and she resisted nothing except the intruders' unlawful

presence in her home. MAPES did not fail to comply with any order because no order was given

to MAPES. HAMER used objectively unreasonable, excessive and deadly force in attempting to

subdue the innocent MAPES and he intentionally and recklessly disregarded her constitutional

rights secured by the Fourth Amendment.

95.    The acts of HAMER deprived MAPES of her right to be free from unlawful search and seizure and the use of excessive and deadly force and otherwise deprived MAPES of due process of law.

96.    As a direct and proximate result of the unconstitutional conduct and unreasonably excessive and deadly force used by HAMER, as alleged above, MAPES has suffered significant injuries from being shot multiple times, including wounds to her head, face and eye, gunshot wounds to her left leg, gunshot wounds to her right shoulder and arm and damages including severe and crippling permanent bodily injury and the resulting pain and suffering, humiliation and mental anguish, she has suffered the loss of her capacity for the enjoyment of life and costs associated with her criminal defense.

97.    MAPES has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and she is entitled to reimbursement therefore from Defendant ROBERT HAMER pursuant to the provisions of 42 U.S.C. Section 1983.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages against Defendant ROBERT HAMER, together with pre-judgment interest, interest, attorneys fees, costs of the action, and TRIAL BY JURY.

## COUNT III

### Violation of Civil Rights of MAPES Pursuant to 42 U.S.C. §1983 Against WILLIAM MURPHY for False Arrest

98.    Plaintiff realleges the allegations of paragraphs 1-9 and 10-71, above, as if fully set forth herein and further alleges:

99.    MURPHY violated the clearly established and well-settled federal constitutional rights of

MAPES, including, but not limited to, her Fourth Amendment rights of:

a.      Freedom from unreasonable seizure of her person; and

b.      Freedom from arrest without probable cause.

The acts of MURPHY, while acting under color of state law, deprived MAPES of her right to be free from unlawful seizure and false arrest and otherwise deprived her of due process of law in violation of the Fourth Amendment to the Constitution of the United States.

100.    When MURPHY took MAPES' "sworn" statement in the intensive care unit at the hospital, she was at his complete mercy, unable to escape or resist his interrogation.  She was on multiple pain medications and in unbearable pain and MURPHY told her he would not talk to the doctors about her pain until she talked to him. She could not even see MURPHY, who questioned her from behind the bed.  She was isolated from any contact with her family by the Sheriff's Department who refused to allow them to visit until she was charged and posted bond.

101.    MURPHY used the statement made by MAPES that he took in the intensive care unit to establish probable cause for her arrest.

102.    On March 29, 2012, MAPES was arrested by MURPHY without warrant and charged with two felony counts of Aggravated Assault on an Officer in violation of FS 784.07(2)(c), crimes that specify mandatory imprisonment.  The probable affidavit authored by MURPHY, who was not present during the wellness check and had no personal knowledge of what happened during the wellness check, did not name the officers MAPES was charged with assaulting.  MURPHY also completed two "Victim's Form[s]" listing LISENBEE and HAMER as victims of aggravated assault on a law enforcement officer but the purpose of the forms, or who received them, is unknown.

103.    The probable cause statement made by MURPHY to justify the arrest of MAPES said the

deputies entered the residence because they had a report from a credible source that MAPES was

potentially suicidal and they were concerned for MAPES' physical and mental well-being.  It said

the deputies checked the master bedroom and kept saying "Sheriff's Office" and "we're here to

make sure you're okay" and "we're here to help you."  The statement does not report that the

house was dark when the DEPUTIES entered and MAPES was found asleep in her bed until

LISENBEE shined a high intensity flashlight directly into her face.  It says MAPES called out

"who are you?" and "I'll shoot you" but leaves out the fact that when MAPES was told it was the

Sheriff's Department she told the intruders she didn't call the Sheriff's Department; it leaves out

the fact that MAPES said "she didn't care" who the intruders were, they needed to leave; and

leaves out the fact that MAPES clearly told them to "get out of her house."  MURPHY states

under oath MAPES, (a 71 year-old grandmother clad in nothing but her bra and panties) exposed

herself to unknown intruders by standing in the doorway to her bedroom and pointing a gun at the

DEPUTIES.  It says shots were "fired by MAPES and a deputy."  It falsely says when MAPES

pointed the gun "the DEPUTIES started to back out."

104.    On the date of arrest MURPHY had no evidence any of the DEPUTIES misunderstood

MAPES when she told then to leave her home, no evidence any of the DEPUTIES told MAPES

they were backing out and leaving, no evidence HAMER ever even considered leaving, no

evidence that MAPES was given any warning by any DEPUTY they were prepared to use deadly

force against her, no evidence MAPES was ordered to drop her weapon by any DEPUTY, if she

even had a weapon, and  no evidence the DEPUTIES at the scene thought MAPES understood

they were with the Sheriff's Department.

105.   When MURPHY arrested MAPES not a single witness at the scene that night had testified to MURPHY that at the time of the incident MAPES knew who was in her house or why she was shot multiple times, including PALMESE, LISENBEE and HAMER.  In fact, every single witness testified MAPES did not know who shot her, did not know why she was shot, did not know what people were doing in her house while she was asleep and did not know who the people were in her house after she was shot.  When he arrested MAPES, MURPHY knew there was no probable cause, or arguable probable cause, to support the charge MAPES intentionally threatened a law enforcement officer.  In fact, there was no probable cause MAPES had committed any crime at all.

106.   When he arrested MAPES, MURPHY knew from the sworn testimony that MAPES did not have a gun when LISENBEE first spoke to her and MURPHY knew they had testified she only came toward the door holding her gun when the DEPUTIES unlawfully refused to leave her home.

107.   When he arrested MAPES, MURPHY knew from the sworn testimony as soon as MAPES told the DEPUTIES to leave, HAMER did not start to back out or leave, but instead "took the point" and dropped into a commando-style shooting position.

108.   When he arrested MAPES, MURPHY already knew from the sworn testimony that LISENBEE'S statement of events contradicted HAMER'S. LISENBEE, the only officer who was directly in front of MAPES when she was shot, did not see MAPES come out from behind the closed bedroom door and point her gun directly at HAMER and tell him she was going to shoot him. Contrary to HAMER'S statement, MURPHY knew the evidence from the Crime Scene Investigation showed all of the shots fired by HAMER were shot on a left-to-right trajectory

through the closed bedroom door and all of the shots that hit MAPES came through the door before hitting her. MURPHY knew when he arrested MAPES that she could not have been standing in the doorway when HAMER fired because she was shot while standing behind the door.

109.    MURPHY knew when he arrested MAPES that MAPES did not shoot first, because HAMER had already testified under oath that she did not shoot first. In fact, no one even knew her weapon may have discharged until after she had been shot and was lying critically wounded on the floor of her bedroom.

110.    MURPHY knew when he arrested MAPES there was no evidence that MAPES was a threat to anyone. She was frightened and hiding behind the door to her bedroom. She could not even see who was speaking to her because LISENBEE and HAMER were shining lights in her face.

111.    MURPHY knew when he arrested MAPES that her request to the DEPUTIES to leave her house was not an intentional and unlawful threat to law enforcement because she clearly did not believe they were law enforcement and because it was her right to tell the DEPUTIES to leave her home when they were there without a warrant and without consent, she had committed no crime and clearly was not a danger to herself asleep in her bed.

112.    When he arrested MAPES for crimes that mandated a term of years in prison, MURPHY knew that when MAPES was shot, the DEPUTIES were no longer engaged in the lawful performance of any legal duty because they were unlawfully in MAPES' home without a warrant and without consent.

113.    MURPHY arrested MAPES to cover-up the incompetent, illegal and unconstitutional

conduct of the DEPUTIES that entered MAPES' home for a wellness check. MURPHY did not have probable cause to find MAPES had committed the crime of aggravated assault on a law enforcement officer, or any crime, and an arrest without probable cause to believe a crime has been committed violates the Fourth Amendment. No reasonable officer in the same circumstances and possessing the same knowledge as MURPHY could have believed that probable cause, or arguable probable cause, existed to arrest.

114. MURPHY conducted a reasonable investigation before arresting MAPES, but wilfully misrepresented facts uncovered in the investigation, used the facts known to him in a biased manner and ignored or failed to report relevant information negating probable cause.

115. As a direct and proximate result of the unconstitutional conduct of MURPHY, as alleged above, MAPES has suffered damages, including the costs associated with her criminal defense, severe and crippling permanent bodily injury and the resulting pain and suffering, emotional distress, humiliation and mental anguish, and she has suffered the loss of her capacity for the enjoyment of life.

116. MAPES has been required to engage the services of the undersigned counsel and to pay her a reasonable fee for her services, and she is entitled to reimbursement therefore from MURPHY pursuant to the provisions of 42 U.S.C. Section 1983.

WHEREFORE, Plaintiff, PATRICIA L MAPES, now known as PATRICIA L ERMINI, demands judgment for damages against Defendant WILLIAM MURPHY, together with pre-judgment interest, interest, attorneys fees, costs of the action, and TRIAL BY JURY.

## COUNT IV

### Violation of Civil Rights of MAPES Pursuant to 42 U.S.C. §1983 Against WILLIAM MURPHY for Falsifying an Affadavit to Obtain a Unlawful Search Warrant

117.    Plaintiff realleges the allegations of paragraphs -9, 10-33, 36-42 and 46-51, above, as if

fully set forth herein and further alleges as follows;

118.    MURPHY violated the clearly established and well-settled federal constitutional rights of

MAPES in that the Fourth Amendment clearly provides that no warrants shall issue, but upon

probable cause, supported by Oath or affirmation.  The search of MAPES home was in violation

of the Fourth Amendment because it was not supported by probable cause.

119.    MURPHY acted under color of state law in depriving MAPES of her right to be free from

the unlawful search of her home and otherwise deprived her of due process of law in violation of

the Constitution of the United States.

120.    After the shooting, the DEPUTIES were transported from the scene to the Lee County

Sheriff's Delta District station where they were photographed and their weapons and ammunition

were inventoried.  The gun belonging to MAPES was also inventoried.  It is unknown whether the

DEPUTIES were interviewed, but no initial statements by the DEPUTIES have been provided

pursuant to public records requests.

121.    The next morning, March 24, 2012, MURPHY asked a Judge in the Lee County Court to

issue a search warrant for MAPES' residence.

122.    MURPHY'S Probable Cause Affidavit to obtain the search warrant said the investigation

had revealed that after the DEPUTIES entered the residence they encountered MAPES who was

armed with a gun and threatened to kill the deputies.  The Affidavit said MAPES raised the gun

and fired a round and a deputy returned fire striking MAPES in the upper and lower body.

MURPHY stated under oath there was probable cause that MAPES violated Section 782.04, *Fla.*

*Stat.*, attempted murder of a law enforcement officer, in that MAPES raised her gun and fired a

round and a deputy returned fire.

123.   If the DEPUTIES were interviewed at the Delta District Station before MURPHY

executed his probable cause affidavit, and stated the same facts about what happened as were later

stated under oath in their formal interviews, MURPHY would have known that no deputy

returned fire after MAPES fired her weapon, because the DEPUTIES did not even know MAPES'

gun might have discharged until after she had been shot.  If her gun did discharge, the DEPUTIES

did know when it discharged and did not hear it discharge before MAPES was shot by HAMER.

If the DEPUTIES were interviewed before MURPHY executed his Affidavit, then he knowingly

and intentionally provided false sworn testimony to the court to obtain the search warrant when he

stated under oath there was probable cause that MAPES had committed attempted murder of a

law enforcement officer, in that MAPES raised her gun and fired a round and a deputy returned

fire.

124.   There was no probable cause, or even arguable probable cause, to believe that any

evidence sought in a search of MAPES' home would aid in the conviction of MAPES for

attempted murder because MURPHY already knew the gun had not discharged before MAPES

was shot, that MAPES had clearly and repeatedly told the DEPUTIES to leave her home and

MURPHY knew MAPES did not even know after the shooting who was in her home and who had

shot her.  MURPHY already knew MAPES did not threaten to kill anybody but had clearly and

repeatedly warned the DEPUTIES that she had a gun and would shoot if they didn't leave.

125.   MURPHY knew at the time he signed the Affidavit that the door was not open, but maybe

unlocked, MAPES had not made any suicide threats, MAPES was unarmed and asleep in her bed

when the DEPUTIES located her in her home and that after she explicitly and clearly told the

deputies to leave her home, they did not comply with her request.

126.    MURPHY knew at the time he signed the Affidavit and proffered it to the Court to obtain the warrant, that all the bullets fired at MAPES had traveled through a door before they hit her because he was an experienced officer that had been at the scene and could observe the door with all the bullet holes in it and the bloody carpet behind the door, and could see that MAPES could not have raised her gun and fired a round at the deputies and at the same time been behind a door.

127.    The purpose of the search warrant was not to find evidence of attempted murder, but to either scrub the evidence of the DEPUTIES' unconstitutional conduct during the wellness check or to use the search warrant to try and find some evidence of some crime that would justify the unconstitutional conduct of the DEPUTIES in shooting an elderly woman during a wellness check who had committed no crime.

128.    The search warrant for MAPES' home was void and the search unlawful, in that the Judge issuing the warrant was misled by information in the Affidavit MURPHY knew was false and that false information formed the basis for probable cause to issue the search warrant.  Under a totality of the circumstances no reasonably competent law enforcement officer would have concluded that probable cause for the stated crimes existed and that a warrant should issue.

129.    If MURPHY failed to interview the DEPUTIES before executing the probable cause affidavit, then he submitted a sworn affidavit to the Court with reckless disregard for the truth about what happened the evening of March 23, 2012.  Recklessly false statements made by an officer in support of a search warrant where a reasonably a well-trained officer would have known his affidavit would fail to establish probable cause without the false statements, violates the Fourth Amendment.

130.    There was no probable cause to believe MAPES had committed any crime, much less

attempted murder. There was ample evidence that the DEPUTIES entered her home without

consent and without a warrant and when she withdrew any consent based on a community

caretaker, or emergency aid, exception to the warrant requirement and told them to leave they did

not comply and instead used deadly force against her.

131.    MURPHY'S use of an illegal search warrant violated MAPES' Fourth Amendment rights

including her right to an absolute zone of privacy inside her home.

132.    As a direct and proximate result of the unconstitutional conduct of MURPHY, as alleged

above, MAPES has suffered damages, including the costs associated with her criminal defense,

severe and crippling permanent bodily injury and the resulting pain and suffering, emotional

distress, humiliation and mental anguish, and she has suffered the loss of her capacity for the

enjoyment of life.

133.    MAPES has been required to engage the services of the undersigned counsel and to pay

her a reasonable fee for her services, and she is entitled to reimbursement therefore from

Defendant MURPHY pursuant to the provisions of 42 U.S.C. Section 1983.

        WHEREFORE, Plaintiff, PATRICIA L MAPES, now known as PATRICIA L ERMINI,

demands judgment for damages against Defendant WILLIAM MURPHY, together with pre-

judgment interest, interest, attorneys fees, costs of the action, and TRIAL BY JURY.

## STATE LAW CLAIMS

## COUNT V

### Claim Against CHARLENE PALMESE, RICHARD LISENBEE and ROBERT HAMER for Unlawful Search and Seizure

134.    Plaintiff realleges the allegations of paragraphs 1-9, 10-28, 46-51 and 53-71, above, as if

fully set forth herein and further alleges:

135.   The DEPUTIES deprived MAPES of her right to be free from search and restraint in her home without a warrant and otherwise deprived her of due process of law in violation of the laws of the State of Florida.

136.   None of the officers that entered MAPES' home were engaged in any duty related to the duty to investigate and uncover criminal activity, as such their actions did not fall within the scope of their discretionary authority.  Each deputy said leaving was not an option when performing a wellness check under an alleged community caretaker, or emergency aid, exception, to the warrant requirement.

137.   Even if the DEPUTIES initial entry into MAPES' home was permissible to help MAPES under what is alleged as community caretaker, or emergency aid, exception to the warrant requirement, because the officers were told she was in danger or in need of assistance, the DEPUTIES found MAPES asleep in her bed without a weapon and in no immediate danger of committing suicide or needing emergency assistance.

138.   When MAPES told the DEPUTIES in a clear voice to leave her home, any exception to the DEPUTIES' presence in her home without a warrant dissipated because there was no longer any justification for their continued presence in her home.  MAPES recognized that someone was in her home, she was privileged to refuse the continued presence of the unknown person(s), even if they claimed to be DEPUTIES and she gave the DEPUTIES fair and clear warning to get out of her home.  The DEPUTIES refusal to leave arguing they were there to "help" her and their continued unlawful seizure of her person, were objectively unreasonable under the circumstances.

139.   The "help" the DEPUTIES gave MAPES was to unlawfully seize her and shoot her

multiple times, causing grievous and life-threatening injury to her.

140.    After HAMER shot MAPES multiple times through a bedroom door, he handcuffed the injured and elderly woman, who was not a threat to anyone, and continued to search her home. THE DEPUTIES refused to remove the handcuffs even when the handcuffs prevented the emergency medical staff from properly treating MAPES for the multiple gunshot wounds HAMER had inflicted on her. Such continued detention and search by the DEPUTIES was unreasonable and unwarranted under the circumstances.

141.    As a direct and proximate result of the wrongful conduct the DEPUTIES, as alleged above, MAPES has suffered damages, including the costs associated with her criminal defense, severe and crippling permanent bodily injury and the resulting pain and suffering, emotional distress, humiliation and mental anguish, and she has suffered the loss of her capacity for the enjoyment of life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages against Defendant CHARLENE PALMESE, Defendant RICHARD LISENBEE and Defendant ROBERT HAMER, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT VI

### Claim for Battery Against ROBERT HAMER

142.    Plaintiff realleges the allegations of paragraphs 1-9, 10-28, 46-51 and 53-71 above, as if fully set forth herein and further alleges:

143.    At all relevant times, HAMER was acting within the scope of his employment with the LCSO and was engaged in a wellness check, an activity best described as operational in nature.

144.   MAPES told all the DEPUTIES to leave her home and they refused to leave.

145.   HAMER claims MAPES pointed a gun at him, but he never ordered her to drop the gun.
Instead, he shot MAPES, who had committed no crime, multiple times through a door with his
rifle because he claimed he was in fear for his life when he saw her gun.

146.   HAMER battered MAPES when he used excessive and unreasonable deadly force and
shot her through a door multiple times with his rifle.  HAMER intended to shoot MAPES and
harm her and such force was unreasonable and excessive under the circumstances.

147.   HAMER acted intentionally and in bad faith for the purpose of hurting MAPES and his
actions displayed a malicious and wanton disregard for the life and safety of MAPES.

148.   As a direct and proximate result of HAMER'S battery on MAPES as alleged above,
MAPES has suffered damages, including the costs associated with her criminal defense, severe
and crippling permanent bodily injury and the resulting pain and suffering, emotional distress,
humiliation and mental anguish, and she has suffered the loss of her capacity for the enjoyment of
life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI,
demands judgment for damages against Defendant ROBERT HAMER, together with pre-
judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT VII

### Claim for Gross Negligence Against CHARLENE PALMESE, RICHARD LISENBEE and ROBERT HAMER

149.   Plaintiff realleges the allegations of paragraphs 1-9, 10-28, 46-51 and 53-71 above, as if
fully set forth herein and further alleges:

150.   When the DEPUTIES decided to enter MAPES' home without consent and without a

warrant, they were engaged in the operational task of responding to a 911 call under an alleged community caretaker, or emergency aid, exception to the warrant requirement to do a wellness check to prevent possible injury to MAPES, as such, sovereign immunity does not bar a negligence claim.

151.    When the DEPUTIES entered MAPES' home without a warrant to conduct a wellness check, they had a duty of care to conduct the wellness check with reasonable care.

152.    The DEPUTIES breached their duty of care (1) by undertaking to respond to the 911 call at MAPES' home and entering MAPES' home to do a wellness check when they were already fearful and nervous about the dark house; (2) by failing to withdraw when they found MAPES asleep in her bed and clearly not a danger to herself; (3) by failing to withdraw when MAPES told them to leave her home; (4) by failing to tell MAPES to drop her gun, if she had one in her hand, or they would use deadly force; and (5) increasing the risk of harm to MAPES by creating a dangerous situation where MAPES feared for her safety. The DEPUTIES breach of their duty of care resulted in HAMER'S use of unreasonable and excessive deadly force that left MAPES with life-threatening and permanent injuries.

153.    Even after shooting MAPES multiple times, and with MAPES lying on her floor bleeding profusely, HAMER handcuffed her and stepped over her to finish his sweep of the bedroom, bathroom and bedroom closet before administering any assistance to MAPES.  Neither PALMESE nor LISENBEE went near the grievously injured MAPES to render aid.

154.    In conducting the wellness check, the DEPUTIES acted maliciously, willfully, wantonly and with a conscious and reckless disregard for MAPES' life.

155.    As a direct and proximate cause of the DEPUTIES' breaches of their duty of care, MAPES

has suffered damages, including the costs associated with her criminal defense, severe and crippling permanent bodily injury and the resulting pain and suffering, emotional distress, humiliation and mental anguish, and she has suffered the loss of her capacity for the enjoyment of life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages against Defendant CHARLENE PALMESE, Defendant RICHARD LISENBEE and Defendant ROBERT HAMER, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.


## COUNT VIII

### Claim for Negligent Infliction of Emotional Distress Against RICHARD LISENBEE and ROBERT HAMER

156.    Plaintiff realleges the allegations of paragraphs 1-9, 10-28, 46-51, and 53-71 above, as if fully set forth herein and further alleges:

157.    After finding MAPES asleep in her bedroom, LISENBEE shined a bright light in her face and may have told her he was with the Lee County Sheriff's Department. MAPES, who could not possibly see who was talking to her because of the bright light in her face, was extremely frightened and had no reason to believe what LISENBEE said was true as there was no reason law enforcement would be in her home at night. MAPES even told LISENBEE she didn't call the LCSO.

158.    MAPES ordered LISENBEE to leave her home and instead of telling MAPES he and the other DEPUTIES would leave, LISENBEE argued with her and told her he was there to "help"

her.

159.   While LISENBEE was telling MAPES he would help her and refusing to leave, HAMER was assuming a commando-style shooting position by crouching down in the living room preparing to shoot MAPES with his rifle.

160.   LISENBEE claims he saw MAPES' gun at the edge of the door, but instead of telling her to drop the gun, he reached for his weapon because he was "scared shitless." LISENBEE didn't need to draw his weapon, however, because HAMER was already shooting MAPES through her bedroom door.

161.   The negligent acts of LISENBEE and HAMER in arguing with MAPES, refusing to leave her home when she told them to leave and failing to tell the frightened and elderly woman they would use deadly force against her while they were "helping her," placed MAPES in immediate risk of physical harm. Their reckless conduct in failing to comply with MAPES' order to leave her home outrageously inflicted anxiety, fear and emotional distress on her. The conduct of LISENBEE and HAMER was wanton and willful and ultimately resulted in her grievous life-threatening physical injuries and serious emotional difficulty.

162.   The negligent acts of LISENBEE and HAMER caused additional severe emotional distress by leaving MAPES, after she was shot, not only still confused about who was in her house but distraught about why she was shot and extremely fearful she was going to be shot again.

163.   As a direct and proximate cause of LISENBEE and HAMER'S negligent acts, MAPES has suffered damages, including the costs associated with her criminal defense, severe and crippling permanent bodily injury and the resulting pain and suffering, emotional distress, humiliation and mental anguish, and she has suffered the loss of her capacity for the enjoyment of

life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages against Defendant RICHARD LISENBEE and Defendant ROBERT HAMER, together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT IX

### Claim For Malicious Prosecution Against WILLIAM MURPHY

164.    Plaintiff realleges the allegations of paragraphs 1-9 and 10-71, above, as if fully set forth herein and further alleges:

165.    The criminal prosecution of MAPES was the natural consequence of her arrest by MURPHY without probable cause.

166.    MAPES was arrested by MURPHY with malice and without probable cause in that MURPHY:

      a.    deliberately provided false information that MAPES shot first to LCSO, who gave it to the media to bolster the LCSO claim the shooting of MAPES was justified;

      b.    deliberately and falsely told hospital staff that MAPES was a danger to herself and others, and was waving a gun around and threatening to kill deputies and should be held under the Baker Act;

      c.    deliberately kept her isolated under the Baker Act and prevented MAPES' family from even seeing her while she lay in intensive care struggling to survive;

      d.    intentionally and falsely restated the sworn testimony of the DEPUTIES at the scene, intentionally failed to include any fact that did not support probable cause

and ignored the actual physical evidence gathered by LCSO at the scene; and

e.      intentionally ignored and/or fabricated evidence that was material to the question

of probable cause to help his fellow officers and the LCSO justify the use of deadly

force against a 71 year-old woman found asleep in her own home.

167.    MURPHY charged MAPES with two counts of Aggravated Assault on a Law

Enforcement Officer knowing the DEPUTIES were not engaged in the lawful execution of a legal

duty when MAPES was shot, knowing MAPES did not even know who was in her home at the

time of the incident, knowing there was no evidence she knowingly attempted to shoot law

enforcement officers and knowing she had broken no law at all.

168.    There was a bona fide termination of prosecution in favor of MAPES because there was a

declination to prosecute entered in good faith by the State of Florida.

169.    As a direct and proximate result of MURPHY'S conduct as alleged above, MAPES has

suffered damages, including the costs associated with her criminal defense, severe and crippling

permanent bodily injury and the resulting pain and suffering, emotional distress, humiliation and

mental anguish, and she has suffered the loss of her capacity for the enjoyment of life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI,

demands judgment for damages against Defendant WILLIAM MURPHY together with pre-

judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT X

### Claim For Intentional Infliction of Emotional Distress Against WILLIAM MURPHY

170.    Plaintiff realleges the allegations of paragraphs 1-9 and 10-71, above, as if fully set forth

herein and further alleges:

171.   MURPHY deliberately and recklessly used his position of authority as a law enforcement officer to inflict severe mental suffering on MAPES as set forth above and as alleged herein and MURPHY'S conduct was intolerable and outrageous in a civilized society.

**Search Warrant**

172.   MURPHY used the Court's reliance on the relationship of trust and truthfulness between the judiciary and law enforcement to unlawfully obtain a search warrant of MAPES' residence. MURPHY intentionally and knowingly provided false information on a probable cause affidavit to obtain the search warrant and knew that such a search of MAPES' private home would cause her severe emotional distress. His conduct in obtaining the search warrant was an extreme and outrageous abuse of his power and authority as a law enforcement officer and any member of civilized society would find it intolerable and atrocious.

172a.   At the time MURPHY submitted the probable cause affidavit to the court, he stated as "facts" supporting probable cause that after deputies entered MAPES' residence, they "encountered MAPES," who was "armed with a gun and threatened to kill the deputies." Then he stated as fact that "MAPES raised the gun and fired a round. A deputy returned fire." MURPHY did not tell the Court whether these "facts" were based on eyewitness testimony or his basis for knowledge of these "facts."

172b.   When he submitted the probable cause affidavit, MUPRHY knew MAPES' gun was purchased years earlier by MAPES' deceased husband, and she only kept it in the bedroom because she lived in a rural area and was afraid someone would break in at night. He knew this because he talked with MAPES' daughter, the 911 caller, shortly after the incident. He did not tell MAPES' daughter until the end of the lengthy interview what had happened to her mother, and then he told

her she could only get information about her mother from him.

172c. There were only four witnesses to the incident: MAPES and Defendants PALMESE, LISENBEE and HAMER. At the time MURPHY proffered the Probable Cause Affidavit, the only witness that had provided any account of the incident was HAMER, who said while the DEPUTIES were in the house, a female exited the bedroom with a gun in her hand and pointed it at HAMER. In response, he shot the female and after being shot, she fell to the ground. He did not say MAPES fired and he returned fire or that she threatened to kill anyone.

172d. MURPHY was in the residence before submitting the Affidavit and observed that all the bullets fired by HAMER went through a bedroom door and the bloodstains from MAPES' wounds were on the floor behind the bedroom door and inside the bedroom.

172e. If MURPHY talked to any other deputy that responded to the residence, he would have been told that all MAPES said and kept saying before being transported by EMS was, "Who are these people?" "Why are they in my house?" "Why did they shoot me?" and "I was sleeping."

172f. MURPHY was not a witness to the incident, but the probable cause affidavit failed to state the source of any of the "facts" used to establish probable cause for the search warrant.

172g. MURPHY'S Affidavit stated he had probable cause "to believe and does believe" that MAPES committed attempted murder of a law enforcement officer in violation of §782.04, *Fla. Stat.*

172h. When MURPHY submitted his sworn affidavit to the court, he falsely claimed to a judge that trusted law enforcement to be truthful in his court, that he had probable cause to support a charge of murder, and as a result, obtained a warrant so broad in its scope that it allowed LCSO complete and unfettered access to every inch of MAPES' private home, her personal papers, the

intimate items in her drawers and closets, her telephones and her private photographs. LCSO spent three days going through her most personal and private possessions.

172i.   MURPHY'S conduct in obtaining the search warrant and the intrusive search of her home that the warrant allowed was outrageous and intolerable and caused MAPES severe humiliation and severe emotional distress.

**Baker Act**

173.   MURPHY knew with certainty his claims to hospital staff that MAPES should be Baker Acted would cause her severe emotional stress. Even so, MURPHY used his position of apparent authority as a law enforcement officer to falsely claim to hospital staff that MAPES should be "Baker-Acted." Once again MURPHY'S conduct was an extreme and outrageous abuse of his power and authority as an officer and any member of civilized society would find it intolerable and atrocious.

173a.   MURPHY told hospital staff that MAPES was "waving a gun around" and was ultimately shot by law enforcement. MURPHY made these claims to hospital staff before he had interviewed any of the three deputies at the scene and they were the only witnesses to the incident.

173b.   When MURPHY convinced hospital staff that MAPES should be Baker-Acted, he succeeded in having the critically-injured MAPES painfully restrained and isolated from her family and her family's advice and protection and caused her family and the Lee County community to believe she had shot at the DEPUTIES and they "merely" responded because they were in fear for their lives. MAPES was vilified in the press and by the community because she was unable to tell anyone what she remembered of the incident.

173c.   MAPES isolation in the intensive care unit because she was Baker- Acted, a term she

understood as a nurse, caused her distress that was so severe that once she was out of the hospital, MAPES sought the services of a psychiatrist to assure herself that contrary to the public assertions of MURPHY and the LCSO, she was not "crazy."

173d.   MURPHY'S abuse of his authority in having a sane woman whose only offense was telling LCSO to leave her home Baker-Acted, was extreme and outrageous and intolerable in a civilized society.

**Arrest Charges**

174.   MURPHY intentionally falsified of facts to prove MAPES committed aggravated assault and should go to prison just to hide and justify the wrongful actions of the DEPUTIES in responding to a wellness check with deadly force against an elderly lady. MURPHY'S conduct was an extreme and outrageous abuse of his power and authority as a law enforcement officer and any member of civilized society would find it intolerable and atrocious.

174a.   MURPHY knew with certainty that charging MAPES with two felonies requiring mandatory incarceration for a period of years would inflict severe emotional distress and mental suffering on MAPES as well as dire financial hardship to defend herself that might cause her to plea to a lesser charge and end any examination of the DEPUTIES' conduct.

174b.   To support the charges, MURPHY used his position of authority over the isolated MAPES to take her statement while she was in intensive care. MURPHY knew that MAPES was in severe pain and on pain medication and could not "knowingly" waive her Miranda rights. In fact, while he was interviewing her, MAPES repeatedly cried with pain and asked for a doctor and MURPHY told her he couldn't talk to a doctor for her until after she talked with him.

174b.   MURPHY knew when he charged MAPES there was no evidence that MAPES knew who

was in her home when she was shot, that there were no exigent circumstances because the deputies had found MAPES asleep in her bed, that she told the deputies to leave her home and they had refused, that the accounts of HAMER and LISENBEE of the incident were in direct conflict and that neither deputy claimed MAPES had shot first.

175.    In charging MAPES with two felonies requiring mandatory incarceration for a period of years MURPHY intentionally and recklessly caused severe emotional distress to MAPES and his conduct was outrageous.

176.    As a direct and proximate result of MURPHY'S intentional conduct as alleged above, MAPES has suffered severe and extreme humiliation and mental anguish.  MURPHY used his position as a law enforcement officer to cause MAPES severe emotional distress and such conduct on the part of a law enforcement officer is odious and utterly intolerable in a civilized society based on the rule of law.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages for severe emotional distress against Defendant WILLIAM MURPHY together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## COUNT XI

### Claim for Negligence Against SHERIFF MIKE SCOTT For Failure to Properly Train and Supervise

177.    Plaintiff realleges the allegations of paragraphs 1-9 and 10-71 above, as if fully set forth herein and further alleges:

178.    At all times material hereto, SCOTT had a duty to properly train and supervise the DEPUTIES to insure they performed community caretaker operations and law enforcement duties in compliance with the Constitution of the United States as well as the LCSO's own policies and

Page 47 of 52

procedures to ensure that a person's Fourth Amendment rights were not violated.

179. At all times material hereto, SCOTT breached that duty, by among other things, one or more of the following:

    a.     Failure to train and supervise the DEPUTIES on when entry into a private home pursuant to an alleged community caretaker, or emergency aid, exception to the warrant requirement, does not justify the continued and unlawful seizure of a person or the person's property;

    b.     Failure to train and supervise the DEPUTIES on when consent to be inside a residence without warrant and without consent is no longer permissible under the Fourth Amendment;

    c.     Failure to train and supervise the DEPUTIES on what steps must be taken before deadly force is reasonable during a community caretaker operation, including orders and warnings;

    d.     Failure to train and supervise the DEPUTIES on the use of unreasonable and excessive deadly force;

    e.     Failure to train and supervise the DEPUTIES on the constitutional limitations on the use of deadly force;

    f.     Failure to train and supervise the DEPUTIES to only use deadly force as a last resort after all reasonably available lessor efforts, including warnings, have failed and there is a reasonable belief that such force is necessary to prevent imminent death or great bodily harm to the officer or another person;

    g.     Failure to train and supervise MURPHY on requirements of probable cause under

the Fourth Amendment in seeking a search warrant and making an arrest.

180.    SCOTT is liable for the reasonably foreseeable damages resulting from the negligent training and supervision of his employees that placed MAPES in a zone of risk resulting from failure to train.

181.    As a direct and proximate result of SCOTT'S actions in the negligent training and supervision of the DEPUTIES and MURPHY, MAPES has suffered damages, including the costs associated with her criminal defense, severe and crippling permanent bodily injury and the resulting pain and suffering, emotional distress, humiliation and mental anguish, and she has suffered the loss of her capacity for the enjoyment of life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages against Defendant SHERIFF MIKE SCOTT together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY,

## COUNT XII

### Claim for Negligence Against SHERIFF MIKE SCOTT

182.    Plaintiff realleges the allegations of paragraphs 1-9 and 10-71 above, as if fully set forth herein and further alleges:

183.    SCOTT, acting through his deputies, owed a special duty of care to MAPES because of the manner in which his deputies responded to a 911 call for a wellness check.

184.    The DEPUTIES were not at MAPES' home to enforce any law and were not engaged in protection of the general public, but instead affirmatively sought to provide a service to MAPES. Responding to the 911 call for a wellness check was within the scope of the DEPUTIES' employment and operational in nature.

185.    Having undertaken to respond to the 911 call for a wellness check, and having engaged

MAPES directly in conducting the wellness check, the DEPUTIES placed MAPES in a foreseeable

zone of risk by failing to exercise reasonable care in conducting the wellness check, including their

failure to comply with her order to leave her home after it was apparent she was not about to

commit suicide and was not in need of emergency assistance, which increased the risk of harm to

MAPES and subjected her to danger. MURPHY placed MAPES in a foreseeable zone of risk by

failing to exercise reasonable care when he asked for a search warrant and arrested her without

probable cause.

186.    SCOTT, through his DEPUTIES breached the duty of care he owed to MAPES when the

DEPUTIES conducted the wellness check in a negligent manner and that breach caused MAPES

grievous physical injury and mental suffering.

187.    As a direct and proximate result of SCOTT'S negligent training and supervision of the

DEPUTIES and MURPHY, MAPES has suffered damages, including the costs associated with her

criminal defense, severe and crippling permanent bodily injury and the resulting pain and suffering,

emotional distress, humiliation and mental anguish, and she has suffered the loss of her capacity

for the enjoyment of life.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI,

demands judgment for damages against Defendant SHERIFF MIKE SCOTT together with pre-

judgment interest, interest, costs of the action, and TRIAL BY JURY.

### COUNT XIII

### Claim for Defamation Against SHERIFF MIKE SCOTT

(Dismissed by Order of the Court)

Page 50 of 52

188.    Plaintiff realleges the allegations of paragraphs 1-9 and 10-71 above, as if fully set forth herein and further alleges:

189.    SCOTT had no duty to tell the media what had transpired at the MAPES' residence before the investigation was complete, and has often refrained from giving the media any information pending completion of an investigation.

190.    Instead of refraining from making any statements, SCOTT personally issued statements to the news media to justify the DEPUTIES actions to the community that MAPES had fired at the DEPUTIES and they had responded with deadly force because they were in fear for their lives.

191.    SCOTT'S statements about MAPES that she had fired first were false and defamatory and he either knew they were false when he made them or failed to exercise reasonable care to determine the truthfulness of the statements before making the statements to the media.

192.    SCOTT was negligent in failing to fully ascertain the facts before telling the media what transpired at the MAPES' residence between MAPES and the DEPUTIES.

193.    The statements made by SCOTT resulted in damage to MAPES in that she was subjected to ridicule and condemnation by the local community.

WHEREFORE, Plaintiff, PATRICIA I. MAPES, now known as PATRICIA I. ERMINI, demands judgment for damages against Defendant SHERIFF MIKE SCOTT together with pre-judgment interest, interest, costs of the action, and TRIAL BY JURY.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was attached to Plaintiff's Motion to Amend and filed with the Clerk of the Court by using the CM/ECF system on the **21st** day of October, 2016, which will send a notice of electronic filing to the following: BRUCE W. JOLLY,

ESQ., Purdy, Jolly, Giuffreda & Barranco, P.A., 2455 E. Sunrise Blvd., Suite 1216, Ft. Lauderdale,

FL 33304.

By: /s/*Colleen J. MacAlister, Esq.*
COLLEEN J. MacALISTER
Florida Bar No.: 0804711

Law Offices of Colleen J. MacAlister, P.A.
900 Sixth Avenue South, Suite 201
Naples, Florida 34102
Phone: (239) 262-3760
FAX:   (239) 790-5779
colleen@cjmaclaw.com
Attorney for Plaintiff