UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PATRICIA I. ERMINI, f/k/a
Patricia I. Mapes,

      Plaintiff,

v.                              Case No: 2:15-cv-701-FtM-99CM

MIKE SCOTT, in his official
capacity as Sheriff of Lee
County, Florida, CHARLENE
PALMESE,        individually,
RICHARD            LISENBEE,
individually, ROBERT HAMER,
individually, and WILLIAM
MURPHY, individually,

      Defendants.

---

## OPINION AND ORDER

This matter comes before the Court on defendants William Murphy, Mike Scott, Robert Hamer, Richard Lisenbee, and Charlene Palmese's Motions for Summary Judgment (Docs. ##56, 56, 59) filed on January 19 and 20, 2017. Plaintiff filed responses (Docs. #63[1], 64, 65) on February 6, 2017. For the reasons set forth below, Defendants William Murphy, Robert Hamer, Richard Lisenbee, and Charlene Palmese's motions are granted and Defendant Mike Scott's motion is granted in part and denied in part.

---

[1] Plaintiff filed an amended Exhibit 3 to Doc. #63. See Doc. #67.

**I.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. Am.'s Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983) (finding summary judgment "may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of

material fact, then the court should not grant summary judgment."
Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

**II.**

This is a federal civil rights suit arising out of an incident
that unfolded on the evening of March 23, 2012, culminating in the
shooting of plaintiff Patricia Ermini[2] (plaintiff or Mapes) by Lee
County Sheriff's Deputy Robert Hamer (Deputy Hamer).   Plaintiff
filed a twelve-count Amended Complaint (Doc. #52) alleging federal
civil rights and state law claims.   The material undisputed facts
(along with some disputed facts) are as follows:

**A. The Events of March 23, 2012**

On March 23, 2012, at approximately 8:40 p.m., plaintiff's
daughter, Robin LaCasse (LaCasse), called the Lee County Sheriff's
Office from her home in Maine, requesting a welfare check for her
71-year old mother, plaintiff Patricia Mapes, who lived in Fort
Myers, Florida.   During that call, LaCasse told the operator that
she had recently spoken on the phone to her mother, who had been
going through a long and contentious divorce proceeding that had
left her financially ruined.   LaCasse stated that her mother
seemed distraught and suicidal, and LaCasse was concerned because
she had been unable to get back in touch with her mother.   LaCasse

---

[2] At the time of the incident, plaintiff's last name was
"Mapes."   Since the record identifies plaintiff as "Mapes," the
Court will use this last name throughout this Opinion and Order.

informed the operator that her mother had a handgun in her house and suspected that she had been consuming alcohol that evening, even though Mapes had denied doing so to her daughter.  LaCasse told the operator that Mapes liked wine and used to drink wine. After giving the address of her mother's home to the operator, LaCasse was told by the operator that the Sheriff's Office would go check on Mapes and report what they found.

At approximately 8:45 p.m., Deputies Charlene Palmese, Robert Hamer, and Richard Lisenbee were dispatched to plaintiff's home. The information they received prior to reaching the residence was contained in the computer-aided dispatch (CAD) report.  Based on the CAD report, the deputies knew plaintiff's name; age; that she was going through a divorce and was possibly suicidal; that her daughter was concerned for her well-being; that she owned a handgun; and that she was possibly intoxicated.  None of the deputies had had any prior contacts with Mapes or the residence prior to that evening.

Deputy Lisenbee arrived first at about 8:53 p.m., parked his marked sheriff's vehicle nearby, and approached the house alone. Deputy Lisenbee conducted a brief sweep of the exterior of the house, noticing there was a car in the garage.  Deputy Lisenbee then began banging loudly on the front door and announcing "Sheriff's Office."  After seeing no one inside and receiving no response, Deputy Lisenbee found that the front door was closed but

unlocked.   Deputy Lisenbee opened the door, stepped slightly inside while shining his flashlight, announced "Sheriff's Office, Sheriff's Office," and asked if anyone was home.  Deputy Lisenbee observed that no lights were on in the house, it was very dark, and the house was in disarray.  Lisenbee saw an empty wine bottle on the floor of living room.  After receiving no response to his inquiry, Deputy Lisenbee backed out of the house.

Deputy Palmese arrived in a separate vehicle, and Deputy Lisenbee informed her what was going on.  Deputies Lisenbee and Palmese approached the now-open front door[3] and Deputy Lisenbee yelled "Sheriff's Office."  There was no answer.  Deputy Palmese had a bad feeling about the situation because it was so dark and quiet.  The deputies decided to wait for additional backup.

At approximately 8:57 p.m., Deputy Hamer was the last of the three dispatched officers to arrive at Mapes' home.  Deputy Hamer retrieved an AR15 rifle from the trunk of his patrol car, as he would typically do when called to a scene that was known to have a firearm.

---

[3] There was some confusion in the record about the front door. Deputies who arrived after Deputy Lisenbee were not aware that Deputy Lisenbee had opened the front door, and thought that Deputy Lisenbee had found the door "wide open" when he arrived.  It appears this inaccurate information was relayed to dispatch and other officers, since it is included throughout the record. Deputy Lisenbee testified that the front door was unlocked but closed when he arrived, and he opened it before the other officers arrived.

All three deputies testified that it was standard protocol to enter a home when asked to conduct a welfare check, which is what they did next. As the deputies went through the front door, they did not knock but announced themselves by stating "Sheriff's Office" once or twice, but received no response. No lights were on in the home and the deputies did not turn any on. The deputies had drawn their weapons, which had high-powered flashlights illuminating their way. The deputies began "clearing" the interior of the home, beginning with the living room.

The double doors to the master bedroom – which were wood so the officers could not see through them – were both closed. When opened, the doors swung into the bedroom. Deputy Lisenbee opened the right door to the master bedroom[4], stood inside the doorway, shined his flashlight inside, saw Mapes on the bed, and said "Sheriff's Office. Are you ok." Mapes responded by saying "who's there?" Deputy Lisenbee stated that he was with the Sheriff's Office, said he was there to make sure she was okay, and asked "are you okay?" Deputy Lisenbee testified that Mapes told him he had better get out of her house or she was going to shoot him, and to stop shining the flashlight on her. Plaintiff recalled telling the people she had a gun and to get out of her house, but does not

---

[4] Whether Deputy Lisenbee knocked on the master bedroom door before he opened it is disputed in the record.

remember telling them that she was going to shoot them.  Deputy Lisenbee began to back out of the bedroom.

Deputy Hamer was outside the bedroom.  Hearing plaintiff's threat to shoot, Deputy Hamer raised his rifle into a position to shoot at the master bedroom.  Deputy Lisenbee, now outside the bedroom, saw a handgun emerge around the master bedroom door, which was illuminated by flashlights, but did not see plaintiff's body emerge through the doorway.  Through the open side of the door Deputy Hamer saw a gun coming around the corner, and then saw half of plaintiff's body, clothed only in underwear.  According to Deputy Hamer, as plaintiff was walking towards the door she was in a shooting-stance position with both hands on a handgun, finger on the trigger, pointed directly at Deputy Hamer.[5]  Mapes said "I'm gonna shoot you."  Deputy Hamer feared for his life, as well as the lives of the other deputies, and fired seven rounds through the door at plaintiff, never speaking before he shot.[6]  Five of the rounds struck Mapes.

Mapes testified that she woke up in a complete panic to someone saying "she's in here," but had not heard the people knock on the door or announce that they were law enforcement officers.

---

[5] Deputy Palmese did not see plaintiff or the handgun, but could hear Mapes saying that she was going to shoot them.

[6] Deputy Lisenbee was the only one to speak to plaintiff prior to the shooting.

Mapes responded by saying "Get out of my house.  I have a gun."
Plaintiff got out of bed and hid behind the door.  Mapes again
told the intruders to leave, and heard someone say he was with the
Sheriff's Department.  Mapes said she had not called the Sheriff's
Department, and again told the person to get out of her house.
Mapes also told the person to put the light out.  Mapes does not
remember retrieving her gun or pointing it at the deputies, and
never said "I'm going to shoot you."  Mapes testified that she
would never have threatened to shoot because she was taught not to
do that in training to use the handgun.

Deputy Hamer testified he stopped firing because he saw Mapes
fall and saw the gun fall out of her hands.  Deputy Hamer kicked
the gun away, handcuffed Mapes, and continued to clear the area.
The handgun plaintiff had been holding, as well as a spent shell
casing from the gun, were recovered near where she had fallen after
being shot.  Deputy Hamer knew that he had fired first, and only
later discovered that plaintiff's gun had discharged, with a bullet
lodging near the ceiling above where he had been standing.  While
the time frame is not entirely clear from the record, Mapes was
likely shot about two minutes after the deputies entered her home,
and within seconds after she told them to get out of the house.

Deputy Hamer provided emergency medical assistance to the
wounds on plaintiff's leg.  Both the deputies and the emergency
medical personnel testified that plaintiff was very confused about

what had just occurred, repeatedly asked everyone there, "why did you shoot me?," "why were you trying to kill me?," and wondered why there were police in her home trying to kill her because she had not called the police.   Plaintiff had a total of five wound areas and was transported to the hospital and detained under constant supervision by Sheriff's deputies due to suspicion that she had committed a criminal offense.

## B. The Subsequent Investigation, Search, and Arrest

William Murphy, Jr. (Det. Murphy) was the lead detective on the case and conducted a criminal investigation regarding the circumstances of that night.   On March 24, 2012, Det. Murphy completed a search warrant Affidavit based on his initial investigation, and submitted a search warrant application to a state court judge.   (Doc. #56-1, Ex. J.)   In his Affidavit, Det. Murphy relied on information provided to him in the preliminary stages of the investigation at the scene, including witness interviews and his own observations.   Among other things, Det. Murphy stated in the Affidavit that Mapes had been the first to fire her handgun at Deputies Lisenbee and Hamer, to which Deputy Hamer returned fire.   The Affidavit asserts that Det. Murphy had probable cause to believe that Mapes had committed the offense of attempted murder of a law enforcement officer, Fla. Stat. § 782.04, and sought a search warrant to enter and search the house for evidence of that offense.   (Doc. #56-1, Ex. J.)   Based upon the

Affidavit and the Application, a search warrant was issued and served on Mapes' home on March 24, 2012. (Doc. #64-4, p. 19-20.)

Although plaintiff had been detained at the hospital since her transport, Det. Murphy formalized plaintiff's arrest on March 29, 2012, by preparing and serving an Arrest/Notice to Appear Form for Aggravated Assault on a Law Enforcement Officer in violation of Fla. Stat. § 754.07. (Doc. #64-5, pp. 24-25.) Det. Murphy also took Mapes' statement on March 29, 2012 at the hospital. Mapes, still handcuffed to the bed, said that she was sound asleep when she was woken up in her home, but acknowledged that she then heard the officers say they were with the Sheriff's Office. Mapes did not believe that they were the police because she had not called the police to come to her house and did not know why they would have broken into her home. Mapes stated that because they did not want to leave, she shot her gun.

The State Attorney's Office ultimately filed a no information due to insufficient evidence and the charges against Mapes were dropped on June 5, 2012.

### III.

Plaintiff's Amended Complaint (Doc. #52) asserts the following remaining claims[7]: (1) a 42 U.S.C. § 1983 claim against

---

[7] All claims asserted against Deputies Lisenbee, Palmese, Hamer, and Detective Murphy are in their individual capacities. All claims against Mike Scott are in his official capacity as Sheriff of Lee County, Florida.

Deputies Lisenbee, Hamer, and Palmese for violation of Fourth Amendment rights (Count I); (2) a 42 U.S.C. § 1983 claim against Deputy Hamer for the use of excessive force (Count II); (3) a 42 U.S.C. § 1983 claim against Det. Murphy for false arrest (Count III); (4) a 42 U.S.C. § 1983 claim against Det. Murphy for falsifying a search warrant affidavit (Count IV); (5) a state law negligence claim against Deputies Palmese, Lisenbee, and Hamer (Count V); (6) a state law claim against Deputy Hamer for Battery (Count VI); (7) a state law gross negligence claim against Deputies Palmese, Lisenbee, and Hamer (Count VII); (8) a state law claim for negligent infliction of emotional distress against Deputies Lisenbee and Hamer (Count VIII); (9) a state law claim against Det. Murphy for malicious prosecution (Count IX); (10) a state law claim against Det. Murphy for intentional infliction of emotional distress (Count X); (11) a state law claim against Mike Scott in his official capacity as Lee County Sheriff for negligence for failure to property train and supervise (Count XI); and (12) a state law claim against Sheriff Mike Scott in his official capacity for negligence (Count XII).   (Doc. #52.)   The Count XIII defamation claim against Sheriff Scott was previously dismissed (Doc. #45.)

### IV. The Four 42 U.S.C. § 1983 Claims

"Section 1983 creates a private cause of action for deprivations of federal rights by persons acting under color of

state law." Laster v. City of Tampa Police Dept., 575 F. App'x 869, 872 (11th Cir. 2014) (citing 42 U.S.C. § 1983). Deputies Lisenbee, Hamer, and Palmese, and Det. Murphy, move for summary judgment as to the § 1983 claims in Counts I, II, III, and IV primarily on the basis of qualified immunity. At the summary judgment stage the facts are viewed in the light most favorable to plaintiff, but "the Court considers only the facts that were knowable to the defendant officers." White v. Pauly, 137 S. Ct. 548, 550 (2017), citing Kingsley v. Hendrickson, 135 S. Ct. 2466, 2474 (2015)).

**A. Qualified Immunity Principles**

Qualified immunity is an affirmative defense which protects government officials sued in their individual capacities from liability when: (1) they act within the scope of their discretionary authority, and (2) their conduct "violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Jordan v. Mosley, 487 F.3d 1350, 1354 (11th Cir. 2007) (citations and quotation marks omitted).

The first step of qualified immunity analysis requires a government official to demonstrate that he was acting within the scope of his discretionary authority when the allegedly unlawful act occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir.

2002).  If the defendant was not acting within his discretionary authority, he is ineligible for qualified immunity.  Id.

If the government official establishes the first step, the burden shifts to plaintiff to show that qualified immunity is inappropriate.  Jacoby v. Baldwin County, 835 F.3d 1338, 1344 (11th Cir. 2016).  To show qualified immunity is inappropriate, a plaintiff must establish that: (1) the facts, when taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal right, and (2) the federal right in question was clearly established at the time of the violation.  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014); Jacoby, 835 F.3d at 1344.  The Court may consider these two prongs in either order, and the official is entitled to qualified immunity if the plaintiff fails to establish either one.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

**(1)   Acting Within Scope of Discretionary Authority**

"[A] government official can prove he acted within the scope of his discretionary authority by showing objective circumstances which would compel the conclusion that his actions were undertaken pursuant to the performance of his duties and within the scope of his authority."  Rich v. Dollar, 841 F.2d 1558, 1564 (11th Cir. 1988).  The Eleventh Circuit has "interpreted the term 'discretionary authority' to include all actions of a governmental official that (1) 'were undertaken pursuant to the performance of

his duties,' and (2) were 'within the scope of his authority.'" Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (quoting Rich, 841 F.2d at 1564).  See also Roberts v. Spielman, 643 F.3d 899, 903 (11th Cir. 2011).  "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act. Framed that way, the inquiry is no more than an 'untenable' tautology."  Harbert Int'l, Inc. v. James, 157 F.3d 1271, 1282 (11th Cir. 1998).  Rather, the inquiry is "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.  The scope of immunity should be determined by the relation of the [injury] complained of to the duties entrusted to the officer."  Id. (quotation marks omitted).

**(2)  Violation of Federal Right Which Is Clearly Established**

"A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (citation omitted).  The Court employs a two-part inquiry, determining (1) whether the facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a federal right; and (2) whether the right in question was clearly established at the time of the violation.  Tolan, 134 S. Ct. at 1865.  If no federal right is

violated, the claim is over.  If the officer did violate a federal right, the issue becomes whether that right was clearly established at the time of the officer's conduct.

"A right is clearly established only if its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  In other words, existing precedent must have placed the statutory or constitutional question beyond debate.  This doctrine gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." Carroll, 135 S. Ct. at 350 (internal citations and punctuation omitted).  The Court undertakes this inquiry "in light of the specific context of the case, not as a broad general proposition." Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  There need not be a case directly "on point" before the Court may conclude the law is clearly established, "but existing precedent must have placed the statutory or constitutional question beyond debate." Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (citation omitted).  See also Mullenix v. Luna, 136 S. Ct. 305, 308 (2015).  The "clearly established" analysis must identify a Supreme Court case where an officer acting under similar circumstances was held to have violated the federal right. White, 137 S. Ct. at 551

**B. Count I – 42 U.S.C. § 1983 Fourth Amendment Violation**

Count I asserts a claim under 42 U.S.C. § 1983 against Deputies Lisenbee, Hamer, and Palmese for violation of the Fourth Amendment based upon their actions on the night of March 23, 2012, at plaintiff's house.  Plaintiff "concedes the initial entry into her home by the Deputies was reasonable under the Fourth Amendment because they reasonably believed Ermini was in need of emergency assistance based on her daughter's call."  (Doc. #63, p. 11.) Plaintiff asserts, however, that the deputies violated her Fourth Amendment rights when they remained in her home without a warrant after they found she was in no grave emergency or imminent danger of injury and she asked them to leave.  (Id.)

Defendants assert that they are entitled, at a minimum, to summary judgment based upon qualified immunity (Doc. #59, pp. 16-18.)  The Court agrees with defendants.

### (1)  Performing a Discretionary Function

The facts viewed in the light most favorable to plaintiff establish that the actions of all three defendants were undertaken pursuant to the performance of their official duties and were within the scope of their authority as deputy sheriffs.  In Florida, deputy sheriffs have the same powers as the sheriff, Fla. Stat. § 30.07, and among other things are "conservators of the peace."  Fla. Stat. § 30.15(1)(e).  Florida, as many jurisdictions, "expect [police officers] to take those steps that are necessary to ensure the safety and welfare of the citizenry at

large." Ortiz v. State, 24 So. 3d 596, 600 (Fla. 5th DCA 2009) (citation omitted). While working their assigned shift, each deputy was dispatched to the location based upon information received from plaintiff's daughter establishing a basis for concern about plaintiff and potentially others. Pursuant to their normal job duties, the deputies conducted a welfare check after arriving at the residence. The deputies were acting well within their discretionary authority even after plaintiff asked them to leave. Roberts, 643 F.3d at 904.

Accordingly, the deputies were acting within their discretionary authority when they conducted a welfare check and did not exceed the scope of this discretionary authority. Thus, the burden shifts to plaintiff to show that a clearly established constitutional right was violated.

**(2)  Violation of a Clearly Established Constitutional Right**

As noted earlier, plaintiff must show that the conduct of the officer violated a federal right and that the federal right was clearly established at the time. In determining either prong, the Court may not resolve genuine factual disputes in favor of the party seeking summary judgment. Tolan, 134 S. Ct. at 1866.

**(a)  Violation of Fourth Amendment?**

The general Fourth Amendment principles concerning entry into houses are well established. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent

circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, 445 U.S. 573, 590 (1980). While there is a presumption that crossing the threshold without a warrant is unconstitutional, Groh v. Ramirez, 540 U.S. 551, 559 (2004), the Supreme Court has recognized a number of exigent circumstances which qualify as "reasonable exceptions" to the warrant requirement.   Kentucky v. King, 563 U.S. 452, 459–60 (2011).

   "One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City v. Stuart, 547 U.S. 398, 403–04 (2006).   Law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury when they have an objectively reasonable basis for such a belief. Id. at 403.   This exception does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises.   It requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid. Michigan v. Fisher, 558 U.S. 45, 47 (2009).   "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" Brigham City, 547 U.S. at 403 (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978)).

The Court must consider the totality of the circumstance when determining "whether a law enforcement officer faced an emergency that justified acting without a warrant." Missouri v. McNeely, 133 S. Ct. 1552, 1559 (2013).  There is "no doubt" that officers do not violate the Fourth Amendment by opening a door and entering a home when faced with these types of emergency circumstances. City & County of San Francisco v. Sheehan, 136 S. Ct. 1765, 1774-75 (2015).  See also Georgia v. Randolph, 547 U.S. 103, 118 (2006) ("it would be silly to suggest that the police would commit a tort by entering [a residence] ... to determine whether violence ... is about to (or soon will) occur."); Ryburn v. Huff, 565 U.S. 469 (2012).

The only disputed issue in this case is whether the Fourth Amendment was violated when the deputies did not immediately leave the premises once they determined Mapes was alive and uninjured and she told them to leave.  Mapes argues that no reasonable officer could have concluded there was an urgent, on-going emergency, and that a reasonable officer would have known a warrant was required to stay.  (Doc. #63, p. 11.)

It is certainly true that an officer's "warrantless search must be strictly circumscribed by the exigencies which justify its initiation. . . ." Mincey, 437 U.S. at 393.  Unnecessarily extending the duration of the police presence after a lawful entry may indeed turn what was reasonable at its inception into an

unreasonable intrusion.  That, however, was not the situation in this case.  The Court concludes that under the facts of this case, viewed in the light most favorable to plaintiff, there was no violation of the Fourth Amendment by any of the three deputies.

The deputies were lawfully present at a location they had a right to be – in the house conducting a welfare check at the request of a relative.  Prior to their arrival, the deputies knew that the occupant was a 71-year old women who was going through a traumatic divorce, may have been drinking, and had a gun in the house.  The officers knew that the occupant's daughter had called the Sheriff's Office because of her concern for the occupant's welfare.  Upon arriving, the first deputy found no sign of activity, a vehicle in the garage, a dark house, a door which was closed but unlocked, and an empty wine bottle in the living room. There was no response to several loud statements by one of the deputies.  When the deputies entered the house, their additional announcements went without a response.  When the bedroom door was partially opened, a deputy saw an occupant laying on the bed.  The occupant initially did not respond when the officer announced their presence.  While the occupant's response is disputed, plaintiff admits she did say she had a gun and told the people to get out of the house.  Plaintiff then got out of bed and approached the door near the deputies, yelling for the people to leave as she approached.  Deputy Lisenbee, the only officer who entered the

bedroom, had backed out of the bedroom within seconds, and then the shooting started.

The Court concludes that even when viewed in the light most favorable to plaintiff, staying in the house for literally a few seconds after being told to leave did not violate plaintiff's Fourth Amendment right.  The officers clearly had not completed the purpose of their security check, and the concerns expressed by the daughter had not been shown to have dissipated.  If anything, the deputies had simply confirmed the daughter's concerns:  An empty wine bottle was in the living room, plaintiff was in a dark house relatively early in the evening, and she said she had a gun. Even when all of the testimony about the actual gun in plaintiff's possession and her discharge of that gun is not considered, the officers clearly had a reasonable basis to stay in the house as they did.   None of the deputies violated plaintiff's Fourth Amendment rights, so summary judgment as to the Count I, § 1983 claim, is granted in their favor.

### (b)   Violation of Clearly Established Right?

Even if the Court is wrong, and the deputies violated the Fourth Amendment by staying in the house after seeing plaintiff and being instructed to leave, the Fourth Amendment right in this context was not clearly established by the Supreme Court.  There is no evidence that the deputies knowingly violated the Constitution or federal law.  Therefore, the question is whether,

in light of precedent existing at the time, the officers were "plainly incompetent" in staying in the house after plaintiff instructed them to leave. <u>Stanton</u>, 134 S. Ct. at 4-5. The answer is clearly that the deputies were not incompetent.

No decision of the Supreme Court has found a Fourth Amendment violation on facts even roughly comparable to those present in this case. <u>E.g.</u>, <u>Brigham City</u>, 547 U.S. 398; <u>Michigan v. Fisher</u>, 558 U.S. 45 (2009); <u>Carroll</u>, 135 S. Ct. 348; <u>City & County of San Francisco</u>, 135 S. Ct. 1765. Indeed, the Eleventh Circuit has found no violation of the Fourth Amendment under similar circumstances. <u>Roberts</u>, 643 F.3d at 906 (concluding that plaintiff had "cited no binding precedent that clearly established that probable cause and exigent circumstances immediately evaporate once an officer performing a welfare check for a possibly suicidal person sees that the person is merely alive"). Even if the deputies were mistaken in believing their actions in staying were justified after being instructed to leave, they were not "plainly incompetent" in acting under such a belief. Therefore, if plaintiff's Fourth Amendment rights were violated, all three deputies are entitled to qualified immunity as to Count I.

## C. Count II – 42 U.S.C. § 1983 Excessive Use of Force

In Count II plaintiff claims that, given the circumstances of this case, Deputy Hamer violated her Fourth Amendment right to be free from excessive force when he shot her. See <u>Graham v. Connor</u>,

490 U.S. 386, 394-95 (1989) (holding that the Fourth Amendment's freedom from unreasonable searches and seizures includes the right to be free from excessive force).  Plaintiff correctly asserts that her excessive force claim is discrete from the prior Fourth Amendment claim, and is not dependent on the outcome of that claim.

Defendant Hamer seeks summary judgment on Count II based upon qualified immunity.  Plaintiff responds that there are material issues of disputed facts which preclude summary judgment in favor of Deputy Hamer.  The qualified immunity principles summarized supra Section IV.A apply equally to this claim.

### (1)  Performing A Discretionary Function

For the same reasons as set forth above, supra Sec. IV.B(1), the Court finds that the actions of Deputy Hamer were undertaken pursuant to the performance of his official duties and were within the scope of his authority as a deputy sheriff.  The burden therefore shifts to plaintiff to establish a violation of a federal right which was clearly established at the time of the conduct.

### (2)  Violation of a Clearly Established Constitutional Right

#### (a)  Violation of Fourth Amendment?

"When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures." Tolan, 134 S. Ct. at 1865-66, (citing Graham, 490 U.S. at 394).  "The inquiry into whether this right was violated requires a balancing of 'the nature

and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" <u>Tolan</u>, 134 S. Ct. at 1865-66 (citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 8 (1985)); <u>Graham</u>, 490 U.S. at 396.  As the Eleventh Circuit has recently stated:

> Official action constitutes excessive force when it is objectively unreasonable.  To measure the objective reasonableness of official action, we weigh the quantum of force employed against the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether the suspect actively resisted arrest or attempted to evade arrest by flight.  But we do not apply these factors mechanically.  Whether an officer's actions are objectively reasonable is a function of the facts and circumstances confronting them, without regard to their underlying intent or motivation.

<u>Dukes v. Deaton</u>, --- F.3d ----, 2017 WL 370854, at *4 (11th Cir. Jan. 26, 2017) (citations and internal punctuation omitted).  The Court views the circumstances from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and allows for the fact that officers are often required to make "split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." <u>Plumhoff v. Rickard</u>, 134 S. Ct. 2012, 2020 (2014) (quoting <u>Graham</u>, 490 U.S. at 396-97).  The facts, however, are viewed in the light most favorable to plaintiff. <u>Tolan</u>, 134 S. Ct. at 1866.

It is undisputed that Mapes told the officers she had a gun, told the deputies to leave the house, and had gotten out of bed and advanced towards the bedroom door where the deputies were standing.  Although Mapes agrees she was standing near the doorway to the bedroom, she does not recall having a gun in her hand, and denies pointing the gun at the deputies or threatening to shoot. The facts, viewed in the light most favorable to Mapes[8], supports a reasonable belief that Mapes posed a threat of serious physical harm.  It was reasonable for Deputy Hamer to believe that a gun was available to plaintiff for ready use.  That's what Mapes said before approaching the door.  Furthermore, the uncontroverted physical evidence from the scene establishes that plaintiff's gun was found next to her hand upon falling after she was shot, along with a spent shell casing beside it.  Deputy Hamer "was not required to wait and hope for the best."  Jean-Baptiste v. Gutierrez, 624 F.3d 816, 821 (11th Cir. 2010).  "[T]he law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect."  Long v. Slaton, 508 F.3d 576, 581 (11th Cir. 2007). Drawing all inferences in favor of plaintiff, the Court finds that Deputy Hamer acted in an objectively reasonable manner under the

---

[8] The Court gives Mapes the benefit of the doubt that she did not have a gun in her hand.  A person does not create a disputed issue of fact by simply saying she cannot remember the incident.

circumstances, his response was not disproportionate to the circumstances, and he did not violate plaintiff's Fourth Amendment right to be free from the excessive use of force.

### (b)  Violation of Clearly Established Right?

Even if shooting plaintiff was a violation of the Fourth Amendment, Deputy Hamer is entitled to qualified immunity unless plaintiff establishes that Deputy Hamer violated a constitutional right that was "clearly established" at the time of the conduct. Plumhoff, 134 S. Ct. at 2023.  Official conduct violates clearly established law if the "contours of [a] right [are] sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." Ashcroft v. Al-Kidd, 563 U.S. 731, 741 (2011).  Because Fourth Amendment qualified-immunity determinations turn on the reasonableness of an officer's acts in a certain set of facts, the determination of whether a legal right was already clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix, 136 S. Ct. at 308 (citations omitted). The contours of the right are not sufficiently set forth by the generalities of Graham.  The Supreme Court has held that an officer who shot and killed an armed occupant of a house without giving a verbal warning did not violate clearly established Fourth Amendment right. White, 137 S. Ct. 546.  The Fourth Amendment right was not clearly established in the specific context of this

case.   Therefore, even if plaintiff's Fourth Amendment right was violated, Deputy Hamer is entitled to qualified immunity.

**D. Count III– 42 U.S.C. § 1983 False Arrest**

Count III asserts a claim under 42 U.S.C. § 1983 alleging that Det. Murphy violated plaintiff's Fourth Amendment rights by arresting and detaining her without probable cause that she had committed the state law offense of aggravated assault on a law enforcement officer.

Det. Murphy seeks summary judgment on Count III because there was probable cause to arrest or detain plaintiff.   Alternatively, Det. Murphy asserts that at the very least he is entitled to qualified immunity because there was arguable probable cause to arrest and detain plaintiff.   Plaintiff responds that the record is undisputed that she did not know the persons in her house that evening were law enforcement officers, thus negating probable cause, and she was justified in using deadly force to protect herself from what she believed to be intruders into her home.

**(1)   Fourth Amendment Principles**

An arrest qualifies as a "seizure" of a person under the Fourth Amendment.   <u>Al-Kidd</u>, 563 U.S. at 735; <u>California v. Hodari D.</u>, 499 U.S. 621, 624 (1991).   So does the detention of a person. <u>Manuel v. City of Joliet</u>, --- S. Ct. ---, 2017 WL 1050976 (Mar. 21, 2017).   The reasonableness of an arrest and detention under the Fourth Amendment "turns on the presence or absence of probable

cause" for the arrest/detention.  Case v. Eslinger, 555 F.3d 1317, 1326–27 (11th Cir. 2009) (citing Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007)).  "Probable cause to arrest exists when the facts and circumstances within an officer's knowledge are sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1251 (11th Cir. 2013) (citation omitted). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004).

An arrest or detention without probable cause violates the Fourth Amendment, Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997), and a cause of action for damages may be asserted under § 1983.  Brown v. City of Huntsville, 608 F.3d 724, 734 n.15 (11th Cir. 2010).  Plaintiff has the burden of establishing the absence of probable cause to succeed on a § 1983 claim.  Rankin v. Evans, 133 F.3d 1425, 1436 (11th Cir. 1998).  To do so, plaintiff must show that no reasonably objective police officer would have perceived there to be probable cause based upon the totality of the circumstances.  Coffin v. Brandau, 642 F.3d 999, 1006 (11th Cir. 2011).  The existence of probable cause "constitutes an absolute bar" to a § 1983 claim for false arrest.  Rankin, 133 F.3d at 1435.

An officer must conduct a constitutionally sufficient investigation before making an arrest or detention. Kingsland v. City of Miami, 382 F.3d 1220, 1228-30 (11th Cir. 2004); Rankin, 133 F.3d at 1435-36. While officers may not ignore known exculpatory information in deciding whether to arrest, they need not explore every proffered claim of innocence or take every conceivable step to eliminate the possibility of convicting an innocent person. Kingsland, 382 F.3d at 1229; Rankin, 133 F.3d at 1435. An officer may normally rely on a victim's criminal complaint to support probable cause. Rankin, 133 F. 3d at 1441. In deciding whether probable cause exists, an officer is "not required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present a sufficient basis for believing that an offense has been committed. Nor does probable cause require certainty on the part of the police." Dahl v. Holley, 312 F.3d 1228, 1234 (11th Cir. 2002) (citations omitted).

The fact that the arrestee was never prosecuted, or the charges were dropped, or the arrestee was acquitted of any offense stemming from the arrest, does not impact the existence of probable cause. Knight v. Jacobson, 300 F.3d 1272, 1275 (11th Cir. 2002); Lee v. Ferraro, 284 F.3d 1188, 1195-96 (11th Cir. 2002); Marx v. Gumbinner, 905 F.2d 1503, 1507 (11th Cir. 1990).

**(2)  Qualified Immunity For Arrest/Detention Without Probable Cause**

An officer who makes an arrest or detention without actual probable cause is nonetheless entitled to qualified immunity in a § 1983 action if there was "arguable probable cause" for the arrest.  Brown, 608 F.3d at 734; Ferraro, 284 F.3d at 1195; Coffin, 642 F.3d at 1006.  "Arguable probable cause exists if, under all of the facts and circumstances, an officer reasonably could — not necessarily would — have believed that probable cause was present." Crosby v. Monroe County, 394 F.3d 1328, 1332 (11th Cir. 2004). See also Fish v. Brown, 838 F.3d 1153, 1167 (11th Cir. 2016).

**(3)  Application of Principles To This Case**

Plaintiff was arrested and detained as of March 29, 2012, when Det. Murphy served the arrest warrant while plaintiff was in the hospital.  Plaintiff was arrested for two counts of aggravated assault on a law enforcement officer.

"The crime of aggravated assault on a law enforcement officer encompasses the following elements of assault: an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent.  In addition, the assault must be made with a deadly weapon on a law enforcement officer engaged in the lawful performance of his duties.  §§ 784.07(2)(c), 784.011(1),

784.021(1)(a), Fla. Stat." Sullivan v. State, 898 So. 2d 105, 108

(Fla. 2d DCA 2005).  As set forth below, the Court finds that when

Det. Murphy arrested Mapes and caused her detention for this

offense, he had probable cause to do so.

### (a)   Probable Cause to Arrest/Detain

Det. Murphy testified that the totality of the circumstances

led him to believe that as of March 29, 2012, plaintiff had

committed the offense of aggravated assault on a law enforcement

officer, as stated in the Probable Cause Statement (Doc. #64-5, p.

25) and Affidavit for Search Warrant (Doc. #56-1, Ex. J.)  This

was based upon interviews with the deputies involved with the

shooting, who stated that upon entering plaintiff's front door and

her bedroom they announced their presence loudly, and that

plaintiff threatened to shoot them after becoming aware of the

deputies' presence.[9]  Deputies Hamer and Lisenbee told Det. Murphy

that plaintiff pointed a gun around the bedroom door, ready to

shoot, causing Deputy Hamer to fear for both his life as well as

those of the other deputies.  These accounts were consistent with

the physical evidence at the scene, which included a bullet hole

near the ceiling behind the deputies, as well as the handgun that

---

[9] The Probable Cause Statement states that upon learning that
they were law enforcement, Mapes stated, "I don't care who you
are, I'll shoot you."  (Doc. #64-5, p. 25.)  This information was
from Deputy Lisenbee's sworn statement to Det. Murphy given on
March 26, 2012.  (Doc. #56-1 at 127.)

belonged to Mapes lying on the floor near her hand with a spent shell casing accompanying it.

Plaintiff argues that Det. Murphy did not have probable cause because she told Det. Murphy during the March 29, 2012 interview that she heard the deputies identify themselves as law enforcement but that she did not believe them.  Further, plaintiff argues there is no evidence to dispute her position that she did not know they were law enforcement officers, and therefore under Florida law she was allowed to stand her ground and use deadly force. Neither of these arguments, even if factually correct, undermine the existence of probable cause.

An officer is not required to credit a suspect's statement. The evidence known to Det. Murphy provided ample probable cause to support the arrest, and multiple officers contradicted her version of the events.  A victim had told Det. Murphy that Mapes pointed a firearm at officers and threatened to shoot.  The version of the events told by the officers was supported by the physical evidence found at the scene.  The totality of the circumstances provided a sufficient basis for Det. Murphy to believe that an aggravated assault had been committed by Mapes, and therefore Det. Murphy had probable cause to arrest and detain Mapes.

Florida's so-called Stand Your Ground laws do not negate the existence of probable cause.  The Florida Stand Your Ground law, codified in Florida Statutes §§ 776.012 and 776.013, substantially

altered the law governing justifiable use of force by abrogating the common law duty to retreat before resorting to deadly force in self-defense.   At the same time, § 776.032 grants immunity to those who lawfully use force in self-defense, subject to certain exceptions.   If the State charges a person with a criminal offense for using force, that person can assert Stand Your Ground immunity by filing a pretrial motion to dismiss the indictment or information under Florida Rule of Criminal Procedure 3.190(b). The proponent is entitled to an evidentiary hearing at which he or she must prove the facts giving rise to the claimed immunity by a preponderance of the evidence.   See Dennis v. State, 51 So. 3d 456, 464 (Fla. 2010); Bretherick v. State, 170 So. 3d 766, 775 (Fla. 2015); State v. Floyd, 186 So. 3d 1013, 1019-21 (Fla. 2016).

As noted earlier, it is well established that the ultimate disposition of the case after the arrest or detention does not undermine the existence of probable cause.   Knight, 300 F.3d at 1275; Ferraro, 284 F.3d at 1195-96; Gumbinner, 905 F.2d at 1507. Because there was probable cause to arrest and detain plaintiff, the availability of the Stand Your Ground defense does not undermine probable cause or preclude summary judgment.

### (b)  Arguable Probable Cause

Even if there was not probable cause, there was certainly arguable probable cause.   An officer could reasonably have

believed that probable cause was present to arrest and detain Mapes for aggravated assault on a law enforcement officer.

## E. Count IV – 42 U.S.C. § 1983 False Search Warrant Affidavit

Count IV asserts a claim under 42 U.S.C. § 1983 alleging that Det. Murphy violated plaintiff's Fourth Amendment rights by falsifying an Affidavit used to obtain a search warrant for her residence. (Doc. #56-1, Ex. J.) Plaintiff alleges that Det. Murphy intentionally falsified the Affidavit by stating that the investigation had revealed that plaintiff raised her gun and fired a round and a deputy returned fire, and that Mapes had been making suicide threats, when these facts were untrue. Plaintiff also alleges that Det. Murphy omitted material facts from the Affidavit, including that all seven rounds Deputy Hamer fired went through the bedroom door, and that less than two minutes elapsed between the officers' entry into the house and the shooting. Plaintiff asserts that if this false information is removed from the Affidavit there is no probable cause or even arguable probable cause to search the residence. Plaintiff further asserts that if the omitted information is deemed included in the Affidavit, there is neither probable cause nor arguable probable cause of a crime. (Doc. #64, pp. 15-16.)

Det. Murphy seeks summary judgment because the alleged falsehoods were not made recklessly or intentionally, and even after removing any alleged falsehoods and adding any omissions,

probable cause (or at least arguable probable cause) existed to support issuance of the search warrant.  Plaintiff disagrees with these propositions.

"The Warrant Clause of the Fourth Amendment requires that warrant applications contain sufficient information to establish probable cause." Holmes v. Kucynda, 321 F.3d 1069, 1083 (11th Cir. 2003).  "Probable cause to support a search warrant exists when the totality of the circumstances allows the conclusion that there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Kapordelis, 569 F.3d 1291, 1310 (11th Cir. 2009). See also United States v. Martin, 297 F.3d 1308, 1314 (11th Cir. 2002).

Not surprisingly, the Supreme Court has held that the Constitution prohibits an officer from making perjurious or recklessly false statements or omissions in the information put forth to establish that probable cause. Franks v. Delaware, 438 U.S. 154, 156, 165–71 (1978); Malley v. Briggs, 475 U.S. 335 (1986).  While this "does not dictate that the statements be objectively accurate, it does require that they "be 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Holmes, 321 F.3d at 1083 (quoting Franks, 438 U.S. at 165).  The Franks rule is limited to cases of perjurious or recklessly false statements or omissions, and does not apply to negligent misrepresentations or

omissions.  Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994).

Thus, at all relevant times, the law was clearly established that

the Constitution prohibits a police officer from submitting an

application for a search warrant which contains such material false

information or material omissions.  Holmes, 321 F.3d at 1083;

Kapordelis, 569 F.3d at 1309 (citation omitted).  If probable

cause still exists once the misrepresentations are taken out of

the warrant and the omissions are inserted, there is no Franks

violation.  United States v. Capers, 708 F.3d 1286, 1296 (11th

Cir. 2013); United States v. Lebowitz, 676 F.3d 1000, 1010–11 (11th

Cir. 2012).

Thus, qualified immunity will not shield Det. Murphy from

liability for such false statements or omissions if they were

necessary to the probable cause.  Malley, 475 U.S. at 344–45;

Whiting v. Traylor, 85 F.3d 581, 585 n. 5 (11th Cir. 1996); Kelly

v. Curtis, 21 F.3d 1544 (11th Cir. 1994); Jones v. Cannon, 174

F.3d 1271, 1285 (11th Cir. 1999).  Further, an officer is not

entitled to qualified immunity when "the facts omitted ... were

... so clearly material that every reasonable law officer would

have known that their omission would lead to a search in violation

of federal law."  Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th

Cir. 1997) (quoting Haygood v. Johnson, 70 F.3d 92, 95 (11th Cir.

1995)).  However, Det. Murphy is entitled to qualified immunity

if the search warrant was supported by arguable probable cause

with the added or omitted material considered. Brown v. Abercrombie, 151 F. App'x 892, 893 (11th Cir. 2005) (citing Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)).

As noted above, the probable cause required to support a search warrant relates to the fair probability that contraband or evidence of a crime will be found in a particular place. Kapordelis, 569 F.3d at 1310; Martin, 297 F.3d at 1314. A search warrant affidavit need not establish probable cause to believe any particular person committed the crime.

**(1) Who Fired First**

Plaintiff argues that the following statement in the Affidavit is false: "Mapes raised the gun and fired a round. A deputy returned fire . . . ." (Doc. #64, p. 14.) While it is now clear that the statement is false because Mapes did not fire first, there is no evidence that it was intentionally or recklessly false, and its deletion from the Affidavit does not negate the existence of probable cause.

Det. Murphy testified that to the best of his recollection, the source of the information contained in the Affidavit as to who shot first after the deputies had identified themselves as law enforcement officers was a conversation he had with Lieutenant Ryan Bell, as well as Detective Matthew Sands[10], on the evening of

---

[10] Detective Sands testified that he spoke to Deputies Lisenbee, Palmese, and Hamer following the incident on the evening

the shooting.  Det. Murphy also had information from his personal observations at the scene, including the location of plaintiff's handgun and the empty shell casing, and the bullet hole behind the deputies near the ceiling.  Lieutenant Bell had arrived shortly after the incident and spoke to Deputies Lisenbee, Hamer, and Palmese.  Lieutenant Bell testified that it was possible he told Det. Murphy that Mapes shot first, but that he did not recall speaking with Det. Murphy at all about this case and does not know where Det. Murphy would have gotten the information that Mapes shot first.

There is no evidence that the statement Mapes fired first was known to be false by Det. Murphy when made in the Affidavit, or that it was a reckless misrepresentation.  While it is now conceded that the sequence of the shooting was not correct, the physical evidence and the information provided to Det. Murphy supported such a statement.

**(2)  Plaintiff Was Suicidal**

Plaintiff also briefly argues that the following statement in the Affidavit is false: "[Mapes] had been making suicidal threats." Yet LaCasse had informed the operator that her mother was suicidal, and this information was contained in the CAD report which Det. Murphy testified he relied upon for information to include in the

---

of March 23, 2012.

Affidavit.   (Doc. #56-1, Ex. C; Doc. #64-3, p. 60-64.)   Thus,
the statement that plaintiff had been "making suicidal threats"
was not a false or reckless misrepresentation of the facts known
to Det. Murphy at the time.

### (3)  Shots Fired Through Door; Duration of Events

Plaintiff asserts that the Affidavit omits the fact that
Deputy Hamer fired all seven shots through the bedroom door and
that less than two minutes elapsed between the officers' entry
into the house and the shooting.   If the fact that Deputy Hamer
had fired seven rounds through the bedroom door and the short
duration of the event are deemed included in the Affidavit, the
existence of probable cause in not affected.   The search warrant
Affidavit established a reasonable basis to believe there would be
evidence of a crime at the house, no matter how quickly the events
unfolded and how many shots were fired through the door.   The
issue for the search warrant Affidavit wasn't the guilt of Mapes,
but the existence of probable cause to find evidence of a crime in
the house.

The Affidavit contained probable cause to search the
residence even after the allegedly false statements are omitted
and the omissions are included.   Therefore no cause of action is
established.   At the very least, there was at least arguable
probable cause in the Affidavit, entitling Det. Murphy to qualified

immunity.   Accordingly, Det. Murphy is entitled to judgment as to Count IV.

### V. Florida State Law Claims Against Deputies

The Court next addresses the state law claims against the various defendant deputies and Det. Murphy.

### A. Count V – State Law Negligence

Count Five asserts a state law claim for negligence against Deputies Palmese, Lisenbee, and Hamer.   In her Response to the motion for summary judgment, plaintiff states that this is "a poorly drafted count sounding in common law negligence against the Deputies and Plaintiff concedes the claim is already properly stated against Sheriff Scott."   (Doc. #63, p. 18.)   Accordingly, summary judgment is granted as to Count V in favor of all three defendants.

### B. Count VI – Battery

Count VI asserts a state law claim for battery against Deputy Hamer for using excessive force by shooting Mapes during the home welfare check.   Deputy Hamer contends that he is entitled to summary judgment on this claim because his use of force was reasonable in light of plaintiff's verbal threats to shoot and her pointing a firearm at the deputies.   Plaintiff responds that because there are differing accounts of the events prior to the shooting, the issue of reasonableness is for the jury to decide.

Pursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is "clearly excessive." Davis v. Williams, 451 F.3d 759, 768 (11th Cir. 2006) (quoting City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)). "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." Sanders, 672 So. 2d at 47. "A battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances. Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'" Sanders, 672 So. 2d at 47 (quoting § 776.05(1), Fla. Stat.).

Here, the Court has found that the amount of force used by Deputy Hamer was not excessive under the Fourth Amendment (supra, Sec. IV.B(2)). There is no factual dispute that Deputy Hamer believed shooting was necessary, but the issue is whether the amount of force used was reasonable under the circumstances. Even when the facts are viewed in light of plaintiff's version of facts, it was not clearly excessive. Viewed in the light most favorable to plaintiff, Deputy Hamer shot plaintiff when he knew that Mapes had a gun, told the deputies to leave the house, and had gotten

out of bed and advanced towards the bedroom door where the deputies were standing.   Thus, Deputy Hamer is entitled to summary judgment on Count VI.

### C. Count VII -  Gross Negligence

Count VII alleges a state law claim of gross negligence against Deputies Palmese, Lisenbee, and Hamer for their activities during the welfare check.   In her Response to the motion for summary judgment plaintiff stated that "[t]he evidence has not disclosed the actions of Defendants fell outside the scope of their employment" as to this Count.   (Doc. #63, p. 20.)   Therefore, summary judgment is entered in favor of the three deputies on Count VII.

### D. Count VIII – Negligent Infliction of Emotional Distress

Count VIII alleges a state law claim of negligent infliction of emotional distress against Deputies Lisenbee and Hamer for their conduct during the welfare check.   In her Response to the motion for summary judgment plaintiff stated that the "[e]vidence has not revealed the requisite level of bad faith required to sustain this claim."   (Doc. #63, p. 20.)   Therefore, summary judgment is entered in favor of the two deputies on Count VIII.

### E.  Count IX – Malicious Prosecution

In Count IX, plaintiff asserts a state law claim for malicious prosecution against Det. Murphy for arresting her on March 29, 2012 without probable cause and charging her with two counts of

aggravated assault on a law enforcement officer. Det. Murphy seeks summary judgment because a criminal prosecution was never initiated and plaintiff's arrest was supported by probable cause. Plaintiff responds that being arrested was sufficient to start the criminal proceedings and that there was no probable cause for the arrest.

To prevail on a Florida malicious prosecution claim, plaintiff must establish the following elements:

> (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

Debrincat v. Fischer, --- So. 3d ----, 2017 WL 526508, at *2 (Fla. Feb. 9, 2017) (quoting Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1355 (Fla. 1994)). See also Kingsland, 382 F. 3d at 1234. "The absence of any one of these elements will defeat a malicious prosecution action." Kalt v. Dollar Rent-A-Car, 422 So. 2d 1031, 1032 (Fla 3d DCA 1982). The existence of probable cause will defeat a claim for malicious prosecution because lack of probable cause is a necessary element of the claim. Alamo Rent-

A-Car, 632 So. 2d at 1355; Durkin v. Davis, 814 So. 2d 1246, 1248 (Fla. 2d DCA 2002) (requiring plaintiff asserting malicious prosecution claim to establish "an absence of probable cause for the original proceeding").

Under Florida law, the commencement of criminal judicial proceeding requirement is satisfied by either an arrest or prosecution.  Valladares v. Bank of Am. Corp., 197 So. 3d 1, 8 (Fla. 2016) ("Valladares lacked a cause of action under a malicious prosecution theory because he was never arrested, nor was he prosecuted."); Levine v. Hunt, 932 So. 2d 1292, 1293 (Fla. 2d DCA 2006)("an arrest without further prosecution can constitute a basis for malicious prosecution" so that "the State Attorney's subsequent declination to prosecute did not affect, as a matter of law, the presence of the first element."); De Rosa v. Rambosk, 732 F. Supp. 2d 1285, 1302 (M.D. Fla. 2010).  Defendant's argument that a malicious prosecution cause of action requires more than just an arrest is therefore rejected.

The critical inquiry in this malicious prosecution action is whether the arrest was supported by probable cause.  Probable cause exists when the circumstances are sufficient to cause a reasonably cautious person to believe that the person accused is guilty of the offense charged.  Lewis v. Morgan, 79 So. 3d 926, 928-29 (Fla. 1st DCA 2012).  The fact that the arrestee was never prosecuted, or the charges were dropped, or he was acquitted of

any offense stemming from the arrest, does not impact the existence of probable cause.  Phelan v. City of Coral Gables, 415 So. 2d 1292, 1294 (Fla. 3d DCA 1982)("The determinative factor as to the existence of probable cause as an element of a malicious prosecution action is whether the suit was brought without reasonable prospect of success.  Acquittal or dismissal of the charges, as here, does not by itself establish improbability of the suit.")  The Florida Supreme Court has explained that "[i]n an action for malicious prosecution, the question of probable cause is a mixed question of law and fact.  When the facts relied on to show probable cause are in dispute, their existence is a question of fact for the determination of the jury; but their legal effect when found or admitted to be true, is for the court to decide as a question of law."  Mem'l Hosp.-W. Volusia, Inc. v. News-Journal Corp., 729 So.2d 373, 381 (Fla. 1999).  See also Kingsland, 382 F.3d at 1235.

Here, as discussed supra Sec. IV.D(3)(a), the totality of the circumstances provided a sufficient basis for Det. Murphy to believe that an aggravated assault on law enforcement had been committed by Mapes, and therefore Det. Murphy had probable cause to arrest and detain Mapes.  Therefore, Det. Murphy's motion for summary judgment as to Count IX is granted.

### F. Count X – Intentional Infliction of Emotional Distress

In Count X, plaintiff asserts a state law claim for intentional infliction of emotional distress (IIED) against Det. Murphy for obtaining the search warrant with false and omitted information, and thereafter conducting an intrusive search of her home; telling hospital staff that plaintiff should be Baker Acted based upon her conduct during the welfare check; and arresting plaintiff to cover up the deficient welfare check by the other officers. Plaintiff states that the gist of this claim is that Det. Murphy's conduct was intentional, extreme, and outrageous in holding plaintiff responsible for the negligent conduct of the deputies who entered her home. (Doc. #64, p. 19.)

Det. Murphy seeks summary judgment because plaintiff's allegations fail to meet Florida's high threshold standard to impose liability. Plaintiff responds that a reasonable jury could conclude that Det. Murphy's conduct satisfies the Florida evidentiary standard.

Florida courts have a very high standard when evaluating whether conduct is sufficiently outrageous to establish an IIED claim. A plaintiff must show that the defendant's intentional conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278-79 (Fla.

1985).  See also Gallogly v. Rodriguez, 970 So. 2d 470, 471 (Fla. 2d DCA 2007).  Even tortious or criminal intent, or intent to inflict emotional distress, standing alone, is not enough. McCarson, 467 So. 2d at 279.  The conduct must be evaluated on an objective basis; the plaintiff's subjective response to the conduct does not control.  Whether the alleged conduct satisfies this high standard is a legal question "for the court to decide as a matter of law."  Vance v. S. Bell Tel. & Tel. Co., 983 F.2d 1573, 1575 n.7 (11th Cir. 1993) (quoting Baker v. Fla. Nat'l Bank, 559 So. 2d 284, 287 (Fla. 4th DCA 1990)).  See also Liberty Mut. Ins. Co. v. Steadman, 968 So. 2d 592, 595 (Fla. 2d DCA 2007); McCarson, 467 So. 2d at 278-79.  Disputed facts, however, are viewed in the light most favorable to the party not moving for summary judgment.  In situations involving government authority, courts recognize that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position" and consequently "give greater weight to the fact that the defendants had actual or apparent authority over [the plaintiff] as police officers."  Gallogly v. Rodriguez, 970 So. 2d 470, 472 (Fla. 2d DCA 2007).

Here, viewing the facts in favor of plaintiff, the Court finds as a matter of law that Det. Murphy's conduct was not so outrageous, atrocious, or utterly intolerable as to constitute IIED.  Det. Murphy was not present for the welfare check, and his

conduct was limited to the post-event investigation. Even if the false information is redacted and the omitted evidence is considered, there is still probable cause in the search warrant Affidavit.

Plaintiff also claims that Det. Murphy used his apparent authority as a law enforcement officer to falsely claim to hospital staff that plaintiff should be "Baker Acted"[11] because she was "waving a gun around" and was ultimately shot by law enforcement. Plaintiff states that Det. Murphy made these claims to hospital staff before he had interviewed any of the deputies at the scene. In this regard, Det. Murphy testified that he does not recall requesting that Mapes be Baker Acted, and plaintiff has pointed to no evidence to support her claim that Det. Murphy told anyone at the hospital that plaintiff should be Baker Acted. Therefore, any claim for emotional distress on this ground fails.

Finally, plaintiff's argument that Det. Murphy arrested her in order to cover up the deficient actions of the deputies is unavailing. As discussed supra, plaintiff's arrest for aggravated assault on a law enforcement officer was supported by probable

---

[11] The Florida Mental Health Act of 1971 is commonly known as the "Baker Act." Fla. Stat. § 394.451 et seq. The Baker Act allows the voluntary and involuntary institutionalization and examination of an individual suffering from a mental illness and who is considered a harm to self, a harm to others or is self-neglectful. Id. at §§ 394.4625-467. It is not clear from the record whether plaintiff was every Baker Acted due to her actions stemming from this incident.

cause, or at a minimum arguable probable cause.   Viewing the evidence in the light most favorable to plaintiff, the Court finds that a reasonable jury could not find that Det. Murphy's conduct in arresting plaintiff was legally impermissible or was otherwise so extreme and indecent as to warrant tort damages under Florida law.   Therefore, Det. Murphy is entitled to summary judgment as to Count X.

**VI. Claims against Sheriff Mike Scott in Official Capacity**

The Court now addresses the two counts against Sheriff Scott in his official capacity.

**A. Count XI – Negligence for Failure to Properly Train and Supervise Deputies**

In Count XI, plaintiff asserts a Florida state law negligence claim against Sheriff Mike Scott in his official capacity for failure to properly train and supervise his deputies in the execution of welfare checks and other law enforcement duties in which they were engaged.   Plaintiff's Amended Complaint (Doc. #52) alleges that Sheriff Scott had a duty to properly train and supervise the deputies, and that he breached that duty by failing to train and supervise them in the following areas:

a. When a welfare check exception to the warrant requirement is no longer permissible under the Fourth Amendment;

b. When consent to be inside a resident without a warrant and without consent is no longer permissible under the Fourth Amendment;

    c. What steps must be taken before deadly force is reasonable during a welfare check, including orders and warnings;

    d. When the use of excessive deadly force is necessary;

    e. Constitutional limitations on the use of excessive deadly force;

    f. Use of deadly force as a last resort after warnings have failed;

    g. Requirements of probable cause under the Fourth Amendment.

(Doc. #52, ¶ 179(a)-(g).)[12]

Sheriff Scott argues he is entitled to sovereign immunity as to this claim. Plaintiff responds that she is challenging the manner in which Sheriff Scott's preexisting policies and programs were implemented, which is an operational-level function, precluding sovereign immunity. The language in Count XI, however, does not support plaintiff's argument.

A claim against a Florida county sheriff in his official capacity is considered a claim against the county he represents. Cook v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir. 2005); Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs, 405

---

[12] While Count XI also contains a failure to supervise component, it is clear that such a claim is barred as a matter of Florida law. A negligent failure to supervise claim requires that the conduct of the deputies have been committed outside the scope of their employment. City of Boynton Beach v. Weiss, 120 So. 3d 606, 610 (Fla. 4th DCA 2013). All the evidence in this case establishes that the conduct of the deputies was committed within the scope of their employment as deputy sheriffs.

F.3d 1298, 1305 (11th Cir. 2005).  Under Florida law, counties are political subdivisions entitled to sovereign immunity to the same extent as the state.  Fla. Stat. § 768.28(2).  "Sovereign immunity is the privilege of the sovereign not to be sued without its consent."  Va. Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 253 (2011).  "In Florida, sovereign immunity is the rule, rather than the exception."  Pan-Am Tobacco Corp. v. Dep't of Corr., 471 So. 2d 4, 5 (Fla. 1984) (citing Fla. Const. art. X, § 13).  Florida has waived its immunity, however, "under circumstances in which the state or agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state."  Fla. Stat. § 768.28(1).

An exception to this waiver of sovereign immunity exists, however, if the challenged acts of the state agent were "discretionary" governmental acts rather than merely "operational" ones.  Lewis v. City of St. Petersburg, 260 F.3d 1260, 1266 (11th Cir. 2001) (citing Dep't of Health & Rehab. Servs. v. Yamuni, 529 So. 2d 258, 260 (Fla. 1988)); Commercial Carrier Corp. v. Indian River County, 371 So. 2d 1010, 1017-22 (Fla. 1979).  Florida's discretionary function exception to the waiver of sovereign immunity applies when "the governmental act in question involved an exercise of executive or legislative power such that, for the court to intervene by way of tort law, it inappropriately would entangle itself in fundamental questions of policy and planning."

Henderson v. Bowden, 737 So. 2d 532, 538 (Fla. 1999) (citation omitted); Kaisner v. Kolb, 543 So. 2d 732, 736-37 (Fla. 1989). Discretionary functions include functions such as "development and planning of governmental goals and policies." Lewis, 260 F.3d at 1266. "An 'operational' function, on the other hand, is one not necessary to or inherent in policy or planning that merely reflects a secondary decision as to how those policies or plans will be implemented." Id. (citation omitted).

An act is discretionary where all of the following conditions have been met: (1) the challenged act, omission, or decision necessarily involves a basic governmental policy, program, or objective; (2) the questioned act, omission, or decision is essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective; (3) the act, omission, or decision requires the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved; and (4) the governmental agency involved possesses the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision. Lewis, 260 F.3d at 1264 (citing Kaisner, 543 So.2d at 736); Commercial Carrier, 371 So. 2d 1010.

Taking the allegations in a light most favorable to plaintiff, Count XI challenges only the contents of the Sheriff's training of

his officers, including what steps must be taken before deadly force is reasonable, the constitutional limitations on deadly force, and when entry into a home is justified to conduct a welfare check.[13]  (Doc. #52, ¶ 179(a)-(g).)   The contents of a training program are discretionary.   Although plaintiff's Response seems to challenge deputy conduct (Doc. #65), that is not the allegations plaintiff has made in Count XI of her Amended Complaint.

Here, as in Lewis v. City of St. Petersburg, the challenged actions of Sheriff Scott regarding the creation or adoption of a program or policy to conduct a welfare check, and his deputies' training under such a program and policy, is clearly an exercise of government discretion regarding fundamental questions of policy and planning.   260 F.3d at 1266 (11th Cir. 2001).   See also Mercado v. City of Orlando, 407 F.3d 1152, 1162 (11th Cir. 2005).   Thus, because Mapes challenges the reasonableness of basic policy decisions made by the Sheriff Scott, the discretionary function exception to the waiver of sovereign immunity applies and her claim is barred.

---

[13] Count XI states, in part: "At all times material hereto, Scott had a duty to properly train and supervise the deputies to insure [sic] they performed community caretaker operations and law enforcement duties in compliance with the Constitution of the United States as well as the LCSO's own policies and procedures to ensure that a person's Fourth Amendment rights were not violated." (Doc. #53, ¶ 178.)

## B. Count XII – Negligence By Deputies and Det. Murphy Attributed to Sheriff Scott

In Count XII, plaintiff asserts a Florida state law negligence claim against Sheriff Mike Scott in his official capacity. Plaintiff argues that Sheriff Scott, acting through his employees, owed a special duty of care to her during the welfare check. (Doc. #52, ¶ 183.) The count further alleges that the Sheriff, through his deputies, breached his duty of care to plaintiff when his deputies failed to exercise reasonable care in conducting the welfare check, including their failure to comply with her order to leave her home after it was apparent she was not about to commit suicide and was not in need of emergency assistance. (Id., ¶ 185.) Furthermore, plaintiff alleges that Det. Murphy failed to exercise reasonable care when he asked for a search warrant and arrested Mapes without probable cause. (Id.)

Sheriff Scott argues that he is entitled to sovereign immunity because, although decisions regarding typical law enforcement activities are generally operational, the Florida Supreme Court has created a clear exception for law enforcement actions in emergency situations, citing City of Pinellas Park v. Brown, 604 So. 2d 1222, 1226-27 (Fla. 1992). Sheriff Scott submits that the situation faced by the deputies here involved the type of risk-balancing emergency situation that requires special deference to their actions. Plaintiff responds that performing a welfare

check is an operational-level function that involves the implementation of a pre-existing policy or program, for which liability is not barred by sovereign immunity.

The Sheriff does not argue that his deputies did not owe plaintiff a duty of care during the welfare check. See Wallace, 3 So. 3d at 1045-56 (finding a common law duty of care if a "safety check" is undertaken, it must be performed non-negligently). Rather, the Sheriff raises the separate question of whether, given a duty of care, he is nonetheless protected by sovereign immunity. The general rule is clearly "no," but the Florida Supreme Court has articulated an exception for certain emergency situations under which the Sheriff seeks shelter.

The Florida Supreme Court has discussed a law enforcement emergency rule in three cases, but has never applied it. See Kaisner v. Kolb, 543 So. 2d 732, 738 n.3 (Fla. 1989); City of Pinellas Park 604 So. 2d 1222, 1227 (Fla. 1992); Rodriguez v. Miami-Dade County, 117 So. 3d 400, 407 (Fla. 2013). Beginning with a footnote in Kaisner, the Florida Supreme Court stated:

> We emphasize, however, that the facts of this case present no countervailing interests, such as the safety of others. The result we reach today would not necessarily be the same had the officers in this instance been confronted with an emergency requiring swift action to prevent harm to others, albeit at the risk of harm to petitioners. The way in which government agents respond to a serious emergency is entitled to great deference, and may in fact reach a level of such urgency as

> to be considered discretionary and not operational.

543 So. 2d at 738 n.3.   In <u>City of Pinellas Park</u>, the Florida Supreme Court outlined what types of cases generally fall within the <u>Kaisner</u> exception:

> the serious emergency must be one thrust upon the police by lawbreakers or other external forces, that requires them to choose between different risks posed to the ***public***.  In other words, no matter what decision police officers make, someone or some group will be put at risk; and officers thus are left no option but to choose between two different evils.  It is this choice between risks that is entitled to the protection of sovereign immunity in appropriate cases, because it involves what essentially is a discretionary act of executive decision-making.

604 So. 2d 1222, 1227 (Fla. 1992) (emphasis added).   The Court also stressed, however, that "this does not mean that state agents can escape liability if they themselves have created or substantially contributed to the emergency through their own negligent acts or failure to adhere to reasonable standards of public safety."   <u>Id.</u>

In 2013, the Florida Supreme Court examined the police emergency exception, recognizing its "extremely limited scope." <u>Rodriguez v. Miami-Dade County</u>, 117 So. 3d 400, 407 (Fla. 2013). The court recognized that "this Court has never had the occasion to determine under what circumstances, if any, the police emergency exception would constitute a planning-level decision under the

[four-part] Commercial Carrier test so as to render the responsible governmental entity immune from liability, as opposed to circumstances surrounding whether the responding police were negligent under the totality of the circumstances." Id. at 408. Because the circumstances of that case did not fall under the emergency exception outlined in Pinellas Park and Kaisner, the Court did not reach the viability of the doctrine. Id. Rather, the Court found that disputed issues of fact remained regarding whether the police created or substantially contributed to the shooting through negligent acts, and whether they perceived that they were facing a serious threat that required the use of deadly force; therefore, the court affirmed the trial court's denial of summary judgment. Id.

In applying the four questions outlined in Commercial Carrier to Count XII, the Court finds that there are at least material disputed facts as to whether the deputies' activities in conducting the welfare check were operational in nature; therefore, sovereign immunity does not bar this claim. The manner in which the officers conducted the welfare check is not a policy-making or planning decision that is protected from tort liability. Although the initial warrantless entry was lawful, triable issues of fact exist as to whether the deputies exercised reasonable care in carrying out the welfare check, which increased the risk of harm to Mapes, and whether Mapes' actions were a reasonably foreseeable

consequence of the negligent acts or omissions of the deputies. Foreseeability is typically a question for the finder of fact. See Cook, 402 F.3d at 1120-21 (whether an intervening cause is foreseeable or reasonably foreseeable if properly left to the trier of fact for resolution).

On the other hand, there are not such material disputed issues as to the investigation conducted by Det. Murphy. His conduct was supported by probable cause and as a matter of law does not support any negligence claim against the Sheriff.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.   Defendant Murphy's Motion for Summary Judgment (Doc. #56) is **GRANTED.**

2.   Defendant Scott's Motion for Summary Judgment (Doc. #57) is **GRANTED as to Count XI, GRANTED as to that portion of Count XII involving the conduct of Detective William Murphy, and DENIED as to the remainder of Count XII.**

3.   Defendants Hamer, Lisenbee, and Palmese's Motion for Summary Judgment (Doc. #59) is **GRANTED.**

**DONE and ORDERED** at Fort Myers, Florida, this __5th__ day of April, 2017.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies:
Counsel of Record